**UNITED STATES ex rel. FOLEY v. RAGEN, Warden, et al.**

No. 43–C–624.

District Court, N. D. Illinois, E. D.

Sept. 30, 1943.

266

Isaac E. Ferguson, Kenneth B. Hawkins, and Leslie H. Vogel, all of Chicago, Ill., for relator.

George F. Barrett, Atty. Gen. of Illinois, Hector A. Brouillet, Asst. Atty. Gen., of Illinois, and Thomas J. Courtney, State's Atty., and James V. Cunningham, Asst. State's Atty., both of Chicago, Ill., for respondents.

BARNES, District Judge.

*Earlier habeas corpus case.* On August 16, 1942, George Foley addressed to the writer and managed to mail from prison a one-page letter, which he entitled "A petition for a writ of habeas corpus." In this letter, Foley stated merely that he was detained in the Illinois State Penitentiary at Stateville, Joliet, in violation of the constitution of the United States. As now appears, on August 16th Foley made an abortive attempt to mail to the writer hereof a petition for a writ of habeas corpus which he had himself prepared. This petition came to the attention of the warden of the prison, then E. M. Stubblefield. On August 25th, the warden sent a memorandum to Foley as follows:

"I cannot comply with the request contained in your note of August 16, as it is not permissible for an inmate to prepare a petition for a writ of habeas corpus within the institution: however, no objection will be made to your arranging with an attorney, relatives or friends to have the petition prepared by them, and you will be permitted to furnish whatever information they require in the formulation of the petition."

On August 31st, the writer hereof acknowledged receipt of Foley's letter of August 16th and explained to him that "nowhere in your petition do you state the facts which makes your imprisonment a violation of the constitution." On September 6th, Foley addressed another personal letter to the writer and stated that he was seeking permission of the prison authorities to send a seven-page petition which he had prepared. The seven-page petition never arrived. This was the petition referred to in the letter of the warden of August 25th. The petition was handed back to Foley. On September 20th, Foley managed to send to the writer "Part 2 of Petition," another one-page writing, in which he stated that he had been convicted of burglary in Springfield, Illinois, in October, 1933, and sentenced to imprisonment for an indeterminate term of one year to life, that the parole board had notified him in writing that his "final sentence" would be 12 years; that the 12 years, less good time earned, expired December 15, 1941, and that the Department of Public Safety, under the 1941 law (that is, the 1941 statute which for the first time gave parole authority to the Department of Public Safety in lieu of the Department of Public Welfare) sentenced him to an additional term of three years. On September 22, 1942, the writer ordered the foregoing correspondence filed in Habas Corpus Case No. 108 and issued a writ, returnable October 12, 1942, and the prisoner was produced, before the judge of the court to whom the case was assigned, on October 12th, but it then ap-

peared that all of his documents had been taken away from him by one of the prison officials and the hearing was deferred in order to obtain production of the essential documents. Meanwhile, however, a return to the writ of habeas corpus was filed by E. M. Stubblefield, warden of the Illinois State Penitentiary, at Joliet, Illinois, in substance as follows:

(1) That the petitioner was in the custody of the respondent by virtue of a mittimus issued October 14, 1933, from the Sangamon County Circuit Court, wherein the petitioner was found guilty of the crime of burglary and larceny and sentenced for the term of one year to life.

(2) That petitioner had not served his full time and was still subject to the orders of the Parole Board of the State of Illinois.

(3) That the petitioner had not exhausted his remedies for release in the State court before applying to this federal court for a writ of habeas corpus.

Because of the jurisdictional objection, the further hearing of the petition was resumed on November 10th without the presence of the petitioner and the petition was denied. No oral testimony was taken and no documents were introduced in evidence. This closed the earlier case (No. 108).

*State court petition.* Promptly after learning of the final order in the earlier case, Foley prepared a petition for writ of habeas corpus to be presented to the Supreme Court of Illinois and asked the warden (now Joseph E. Ragen) for permission to mail it. On November 30, 1942, Warden Ragen wrote Foley as follows: "I am returning herewith your petition for a writ of Habeas Corpus, inasmuch as it is not permissible for same to be mailed out, as there is a rule at this Institution whereby all inmates must have their petitions for writs prepared by a competent attorney, on the outside, or by relatives or friends."

Foley says he then took sick and went to the hospital, and that he then conceived the idea of sending a personal letter to Justice Gunn, asking him if he could send him a petition for writ of habeas corpus. This letter came to the attention of Warden Ragen and on January 8, 1943, the warden wrote to Foley as follows: "I am returning herewith your letter dated January 3rd to the Honorable Walter T. Gunn, inasmuch as prisoners incarcerated in this Institution are now permitted to file petitions for writs of habeas corpus." Thereupon, Foley mailed to the Supreme Court of Illinois his petition for writ of habeas corpus and motion for leave to file said petition in forma pauperis. On March 11, 1943, Warden Ragen sent a notice to Foley as follows:

"I am today in receipt of the following letter dated March 9th, 1943 from Edward F. Cullinane, clerk pro tempore, Supreme Court, State of Illinois, Springfield, as follows:

"'Re: No. 27136 ex rel. Foley v. Ragen. The Supreme Court today denied the motion of the petitioner in the above entitled case for leave to sue as poor person and for writ of habeas corpus.'"

Foley says that he then prepared a petition for rehearing addressed to the Supreme Court of Illinois, but never sent it. "I was under the impression at that time that I couldn't sue as a poor person, so I decided it would be useless to send it." Instead, he prepared another petition to this court and a petition to the Supreme Court of the United States.

*Petition of March 19, 1943.* The petition now before this court consists of an original petition dated March 19, 1943, and "motion for leave to amend" sworn to by the petitioner on June 22, 1943. All of the papers sent to the writer by Foley on March 19, 1943, and subsequently were filed in this case on June 30, 1943, and on that date the writer entered an order in substance as follows:

(1) On the court's motion, leave granted to George Foley to file his petition for writ of habeas corpus as a poor person and without advance payment of costs.

(2) That a writ of habeas corpus issue against Joseph E. Ragen, Warden, directing him to produce the body of the petitioner before this court on July 7, 1943.

(3) That a member of the bar of this court be appointed attorney for the petitioner.

(4) That the hearing on the petition and return shall preliminarily deal with the question as to whether or not petitions for writs of habeas corpus by inmates of the Illinois State Penitentiaries at Joliet, are permitted to be sent out without restrictions, whether restrictions have ever at any time been imposed upon the sending out of such petitions, and, if they have, when such

restrictions were removed, if they have been removed.

*Petition in Supreme Court of the United States.* On May 5, 1943, Foley asked one of the prison officials to cause to be mailed to the Supreme Court of the United States a petition for a writ of habeas corpus. Warden Ragen received a letter from the clerk of the Supreme Court of the United States dated May 14, 1943, as follows: "I have your letter of the 11th enclosing an application for writ of habeas corpus on behalf of George Foley. This application will be presented to the Court and you will be advised of the action taken thereon." A copy of the foregoing letter was received by Foley, also a further letter from the clerk of the Supreme Court of the United States, dated June 7, 1943: "In the matter of ex parte George Foley, October term, 1942, the Court today denied the motion for leave to file petition for writ of habeas corpus without prejudice to the pending application in the District Court."

*Issues raised by petition and return.* The petitioner relies on the following propositions:

1. That his imprisonment, which has already run nearly ten years, has been from its commencement unlawful and in violation of the due process of law guaranteed to him by the 14th amendment to the Constitution of the United States in that, at his trial in the Circuit Court of Sangamon County, Illinois, which resulted in the judgment and sentence upon which he is now detained, he was not in true sense and in good faith afforded the assistance of counsel. That, instead, he was compelled to accept perfunctory representation by a lawyer appointed by the court to defend him, but who declined to call any witnesses for the defense, although such witnesses were available, and devoted himself solely to an effort to induce the petitioner to plead guilty upon a charge of which he was innocent.

2. That on October 16, 1934, after hearing on petitioner's (automatic) application for parole, the Parole Board of Illinois fixed the final date of petitioner's imprisonment as October 31, 1945.

3. That the action taken by the Parole Board October 16, 1934, was within the authority and power vested in said board by the laws of Illinois; also in accordance with the rules and regulations then in effect governing paroles (which rules and regulations were adopted by the board pursuant to the rule making power granted to the board by statute).

4. That the division of correction, of the Department of Public Safety of Illinois, which board or agency was created by a statute of Illinois enacted May 16, 1941, effective July 1, 1941, and given jurisdiction of paroles in lieu of the former parole board (a division or agency of the Department of Public Welfare), entered an order on November 14, 1941, annulling the action taken by the former parole board on October 16, 1934, and continuing the sentence of the petitioner to October 31, 1948. That this action of the division of correction was unauthorized by the laws of Illinois; that it was contrary to the rules and regulations governing paroles on October 16, 1934, when petitioner was given a final date of October 31, 1945; that this action of the division of correction was taken without notice or hearing to the petitioner; that this action in practical effect canceled the good time earned by the petitioner from the date of the commencement of his imprisonment until November 14, 1941, although all of this period the petitioner maintained an A grade and there was no cause to cancel his good time or any part thereof.

The return to the writ of habeas corpus filed by Warden Joseph E. Ragen presents the following points: First, that this court lacks jurisdiction to grant the relief prayed for by the petitioner, for the reason that the petitioner has not exhausted his remedies in the state court; second, that petitioner has asked this court to review the final decision entered by the Circuit Court of Sangamon County, Illinois, in the case of People of the State of Illinois v. George Foley; that the petition shows on its face that it is insufficient in law, therefore should be quashed, because the petitioner is in the custody of the respondent under the judgment order and mittimus of the Circuit Court of Sangamon County, Illinois, entered October 14, 1933, adjudging him guilty of burglary and larceny and sentencing him to serve a term of one year to life; petitioner has not served the sentence in full; the petition does not allege facts to show that the petitioner has become entitled to his discharge.

*Jurisdiction.* Since the earlier case No. 108 in this court was closed, the petitioner has made an effort to have his application for writ of habeas corpus heard by the Supreme Court of Illinois, but this effort

has proved unavailing. The petitioner was unable to pay the filing fee required by the Supreme Court of Illinois, therefore made a motion for leave to file his petition in forma pauperis. His motion was denied and with it the petition. No preliminary writ was issued and no return to the petition was required, therefore no issues of law or fact were heard, considered or determined by the Supreme Court of Illinois.

It is suggested by the respondent that the petitioner has not exhausted his remedies in the state court, "in that he has not filed proceedings for review in the United States Supreme Court." Presumably this means proceedings for review of the order made by the Supreme Court of Illinois on March 9, 1943, viz.: "The Supreme Court today denied the motion of the petitioner in the above entitled case for leave to sue as poor person and for writ of habeas corpus." All that this order amounts to, obviously, is a refusal or declination by the Supreme Court of Illinois to take jurisdiction of Foley's petition. Such order certainly was not an adjudication from which an appeal could have been taken to the Supreme Court of the United States. Rather, the mere refusal or declination of the Supreme Court of Illinois to take jurisdiction in a case of habeas corpus, when called upon to exercise its discretionary authority to permit such petition to be filed in forma pauperis, did not of itself give rise to any question under the Constitution of the United States, or any question otherwise cognizable by the Supreme Court of the United States on an application to review a judgment order of a state court.

Another answer to any jurisdictional objection that may be raised in this case is the letter which the petitioner wrote to the writer on December 17, 1941, but was not permitted to mail. That letter was written just a month after the division of correction undertook to annul the parole board order of October 16, 1934, pursuant to which the petitioner should have been released December 15, 1941. In this letter Foley wrote to the writer as follows: "Being a pauper I am defenseless against this latest injury by a vengeful state. I shall try to petition the trial court for habeas corpus because of numerous constitutional and statutory violations." Not only was Foley denied leave to send this letter to the writer, but for a period of more than a year after the date of this letter he was denied permission to send any petition for a

writ of habeas corpus to a state court (i. e., until January 8, 1943, when Warden Ragen informed him that the rule denying permission to prisoners to send out petitions for writs of habeas corpus had been suspended or abrogated). After years of interference with Foley's attempts to obtain a hearing in the state court, and especially after his rebuff of March 9, 1943, from the Supreme Court of Illinois, it is with poor grace that the State now argues that this court should not exercise jurisdiction because Foley has not exhausted his remedy in the state court.

The court believes that it understands the rule announced by the Supreme Court of the United States in the case of United States v. Tyler, 269 U.S. 13, 17, 46 S.Ct. 1, 3, 70 L.Ed. 138: "The rule has been firmly established by repeated decisions of this court that the power conferred on a federal court to issue a writ of habeas corpus to inquire into the cause of the detention of any person asserting that he is being held in custody by the authority of a state court in violation of the Constitution, laws, or treaties of the United States, is not unqualified, but is to be exerted in the exercise of a sound discretion. The due and orderly administration of justice in a state court is not to be thus interfered with save in rare cases where exceptional circumstances of peculiar urgency are shown to exist." and the further rule which was announced by that court in Mooney v. Holohan, 294 U.S. 103, at page 115, 55 S.Ct. 340, at page 343, 79 L. Ed. 791, 98 A.L.R. 406: "Orderly procedure, governed by principles we have repeatedly announced, requires that before this Court is asked to issue a writ of habeas corpus, in the case of a person held under a state commitment, recourse should be had to whatever judicial remedy afforded by the state may still remain open."

Foley asserts that he is being held in custody by the authority of a state court in violation of the Constitution of the United States. Foley's petition and his proof show that he has exhausted his remedies under the laws of the State. But the question remains whether or not this is that rare case where exceptional circumstances of peculiar urgency are shown to exist. The court is of the opinion that the facts, that for a period of years petitions for writs of habeas corpus were not permitted to be sent out of the Illinois penitentiaries by inmates of those institu-

tions and that the right to send out such a petition was denied to the petitioner, make this that rare case of which this Federal court—albeit an "inferior" court—should take jurisdiction. See, also: Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; Walker v. Johnston, 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830; Howard v. Dowd, D.C.N.D.Ind., 25 F.Supp. 844.

■ *Assistance of counsel.* At first impression it may seem rather tardy for George Foley—after 10 years of imprisonment—to complain that in the trial which accounts for his imprisonment he was denied in any true sense the assistance of counsel. However, it clearly appears that Foley's claim is not an afterthought, not a claim conjured up long after the trial, but a claim that he desired to voice immediately after the time of his trial but was prevented from asserting by the prison authorities of the State of Illinois. On the undisputed showing (1) that Foley could not get assistance of a lawyer to take an appeal, (2) that his own attempt to take an appeal was frustrated by the prison authorities, and (3) that from the time of his commitment in October, 1933, until January 8, 1943, inmates of the Illinois State Penitentiary were not permitted to prepare and send out petitions for habeas corpus or other court papers, the tardiness of the petitioner's claim that he was denied effective assistance of counsel should not operate to his prejudice. No blame attaches to the petitioner for his failure to assert this contention at an earlier time. If it is necessary to do so, there seems to be no valid reason why this court should not consider the contention of the petitioner that he was denied effective assistance of counsel, even though 10 years have passed since the time of the trial.

■ The right of an accused person to the assistance of counsel is a fundamental requisite of the due process of law, protected by the due process clause of the 14th amendment (as well as by the 6th amendment). See Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Smith v. O'Grady, 312 U.S. 329, 61 S.Ct. 572, 85 L.Ed. 859; Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595.

The Constitution of Illinois provides (Constitution of 1870, art. II, Sec. 9, Smith-Hurd Stats.): "In all criminal prosecutions the accused shall have the right to appear and defend in person and by counsel * * *."

The legislature of Illinois, by an act adopted March 27, 1874, declared: "Every person charged with crime shall be allowed counsel, and when he shall state upon oath that he is unable to procure counsel, the court shall assign him competent counsel, who shall conduct his defense." (Ill.Rev. Stats.1941, ch. 38, Sec. 730.)

■ The right to assistance of counsel means more than the mere nominal designation by the court of a lawyer to represent the accused and the mere perfunctory participation in the trial of such appointee as attorney for the defendant. It means, rather, that the accused is entitled to the good faith assistance of a lawyer in defending the accused against the indictment upon which he is put to trial. (For illustrative discussion of the nature and extent of the assistance of counsel to which the accused is entitled, see: Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; Glasser v. United States, 315 U.S. 60, 68-76, 62 S. Ct. 457, 86 L.Ed. 680; People v. Rose, 348 Ill. 214, 180 N.E. 791).

The undisputed testimony of the petitioner is as follows:

"In 1933 I finally got mixed up with a couple of fellows and we got riding around the country in a stolen truck. In Champaign we were arrested. The truck had been stolen some time before that out of Springfield, but I was arrested in Champaign early one morning. The truck was parked there. It had been abandoned. We were sleeping in the park."

"I wasn't in Springfield. I met them (the other two men) in Chicago. They were here with the truck in Chicago. That was the first time I saw the truck. I went from Chicago to Champaign. I was arrested in Champaign. I was taken to Springfield by the police, charged with stealing a truck." (Tr. 14.)

Foley further testified that he was tried in the Sangamon County Circuit Court; that the trial judge appointed an attorney as his counsel; that the attorney was appointed at the time of the arraignment, when Foley pleaded not guilty; that a couple of months intervened between the arraignment and the trial, during which time Foley was in the county jail.

Foley was then asked if the atttorney conferred with him during this period, to which he answered:

"He did come over once or twice and he insisted I plead guilty. He said the county was broke and could not afford to bring any witnesses down. He got mad about it because I would not plead guilty. I would not plead guilty at any time, considering—

"Q. Did he do anything to procure any witnesses? A. None whatever. He refused. He kept telling me the county was broke and could not be sending for witnesses.

"Q. When the case came to trial, did you have any witnesses? A. None.

"Q. Did you know of some witnesses who might be called in your behalf? A. I did. I wanted to look up some flop house records down here. I believe I stayed in a cheap place, twenty or twenty-five cent rooms. That is all the money I had. On West Madison Street. I couldn't give the exact address, because I stayed one place one night and another the next, and I wanted an investigation made, and particularly one where I had my suitcase, and I wanted to see if my name was on that register for that particular night.

"Q. Was that the time of the burglary? A. That was the time of the burglary in Springfield."

"Q. Did you name or suggest any other witnesses who might be called on your behalf? A. I don't recall the exact circumstances, but I wanted a police officer or someone brought from Champaign also to testify in my behalf. They brought a police officer from Champaign to testify to certain things as to my arrest, and if I recall the incident, I wanted somebody subpoenaed from Champaign. I don't recall whether it was the prosecutor or chief of police that was testifying, but I wanted somebody to contradict some of the statements he made as not true."

"Q. Did any witness testify in your case for the defense? A. None except myself.

"Q. On the day of the trial when the trial commenced, did your lawyer further urge you to plead guilty? A. He insisted on it. I would like to relate the circumstances. The prosecutor got up and he had put no testimony on to show that I was ever in Springfield or ever in any way connected with the stealing of the truck, so he asked for a half hour recess to locate a witness who actually saw me drive that truck from the garage. The court granted a half hour recess and he left and sent some deputy out to look for this fellow, and while he was gone this lawyer said, 'Plead guilty, the jig is up. I know this man personally and I know he is going to point you out as the man that drove that truck from the garage.' I told him, 'I am not pleading guilty. They can't bring in no man that saw me drive that truck out of the garage.' A half hour later they found the man, a little old man with a grey sweater. The prosecutor brought him over to me and he said, 'Is that the man that you saw drive the truck?' He said, 'No, that is not the man that I saw drive the truck.' The prosecutor became so incensed he grabbed the man by the arm and drove him out of the court room. I told my lawyer to get the man, to put him on for me. He didn't call him. Then I hollered to the judge about it. I told him it was my right to have witnesses processed in my behalf. He told me to sit down, that I have a lawyer to speak for me.

"Q. Did the lawyer ask the court for leave to call this man? A. No, he made no motion of any kind whatever."

Apparently the trial was a summary affair. Foley says that it lasted only about an hour. The entire testimony against him, according to Foley's account of the trial, was that of two police officers from Champaign who testified that they found him in Champaign near the truck, also testimony of a witness who identified the truck as property of the International Harvester Company.

Foley was then asked if, after his trial, he did anything in an attempt to appeal from the judgment. He answered:

"Well, I think the first thing I did was write this lawyer and ask him to do something. He never answered my letters. Then I decided to go ahead and try it myself. I was then in Menard, in Southern Illinois Penitentiary. I attempted to make my handwritten petitions out myself in appealing to the Illinois Supreme Court, and I got a letter from—I don't know whether it was Mr. Montgomery or Mr. Ragen, both of them were almost equal in power down there at that time, telling me that I would have to have a lawyer to do it for me; that prisoners were not allowed to do it.

"Q. That happened very soon after you were in prison? A. Within 60 or 90 days after I was in there.

"Q. Did any paper get out of prison? A. Not to my knowledge.

"Q. Do you know whether the letters that you sent to ———— were received by him? A. Well, I can't say as to that.

"Q. You got no answer? A. I got no answer, that is all I know."

Foley said that the petition, or whatever paper he prepared for the court, remained in his possession; that he inquired whether he could send it out and was denied permission to send it out; that he thereupon tore up all the papers. "I gave up in disgust and settled down to do my sentence."

In 1933 Foley was 42 years old. The story of his life is indeed sordid. He was born in California, born into trouble. Early in his childhood his father died and at the age of 14 or 15 he became an inmate of a reform school. When he left the reform school, he raised an $8 check to $80 and tried unsuccessfully to pass it. He was convicted of forgery.

In the trial at Springfield, it is true, the court appointed a lawyer to assist Foley in making his defense. But if credence is to be given to Foley's testimony, which stands uncontradicted, the lawyer proceeded upon the assumption that his wretched client was guilty and that it was useless to do anything except to withdraw the plea of not guilty and to enter a plea of guilty. In Springfield there was no witness available to Foley and to find witnesses elsewhere called for some effort and expense, beyond the inclination and perhaps even beyond the strict duty of the lawyer appointed to serve without pay. To investigate the registers of Madison Street "flop houses" at the request of an ex-convict was an uninviting and seemingly a futile undertaking, but it may nonetheless be true, as Foley claims, that such an investigation would have definitely established Foley's innocence. Be that as it may, there is the more immediate circumstance of the witness who came into the courtroom and told the prosecuting attorney that Foley was not the man who drove the truck out of the garage, yet was not called to the stand as a witness for the defense. And, according to Foley's uncontradicted testimony when he asked the judge to help him procure the testimony of this witness, as was his constitutional right (Illinois constitution, art. II, Sec. 9; United States constitution, amendment VI), the judge told him to sit down, that he was represented by counsel.

It may be urged by the respondent that Foley's testimony in his own behalf, even though uncontradicted, is not worthy of belief. There is a great difference between rational scepticism and arbitrary disbelief. The striking thing about Foley's testimony, in its entirety, is that he made little effort to spare himself.

■ The respondent, in effect, demurs to the petitioner's evidence. The respondent says that Foley is asking the court to review the judgment of the Circuit Court of Sangamon County. This is a quibble. What Foley is asking the court to decide is whether or not, in his trial at Springfield, he was afforded the due process of law to which he was entitled under the 14th amendment. If not, the trial and the judgment must be declared nugatory, and the prisoner discharged. Howard v. Dowd, D. C., 25 F.Supp. 844. It is not a question of error or lack of error in the trial of Foley's case, but a question whether in truth there was any trial at all. In Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 267, 67 L.Ed. 543, the author of the dissenting opinion was contemptuous of the affidavits "of these five ignorant men whose lives were at stake," and the affidavits of "three other negroes who had pleaded guilty," and the affidavits of "two white men—low villains according to their own admissions." But the majority of the court were not so disdainful of these affidavits and held that the District Court erred in dismissing the writ of habeas corpus upon demurrer: "We shall not say more concerning the corrective process afforded to the petitioners than that it does not seem to us sufficient to allow a Judge of the United States to escape the duty of examining the facts for himself when if true as alleged they make the trial absolutely void. We have confined the statement to facts admitted by the demurrer. We will not say that they cannot be met, but it appears to us unavoidable that the District Judge should find whether the facts alleged are true and whether they can be explained so far as to leave the state proceedings undisturbed."

*Action of parole board.* The petitioner was committed to prison on October 14, 1933. At that time, by virtue of the Civil Administrative Act of March 7, 1917, there was vested in the Department of Public Welfare the power:

"4. To exercise the rights, powers and duties vested by law in the commissioners, warden, deputy wardens, chaplains, physicians, stewards, matrons, turnkeys, watchmen, and all other officers and employees of the Illinois State penitentiary at Joliet;

"5. To exercise the rights, powers and duties vested by law in the commissioners, warden, deputy warden, chaplain, physician, steward, matron, turnkeys, watchmen, and all other officers and employees of the Southern Illinois penitentiary;

\* \* \* \* \*

"9. To exercise the rights, powers and duties vested by law in the board of pardons, its secretary and other officers and employees." Laws 1917, p. 2, Sec. 53, Smith-Hurd Stats. c. 127, § 53.

The sentence and parole act of Illinois in force at the time of Foley's commitment was the act of June 25, 1917, as amended June 30, 1933. Smith-Hurd Ill.Annot.Stats. ch. 38, Secs. 801–816. Section 801, relating to sentences for treason, murder, rape and kidnapping, authorized the jury or court to fix a definite term of imprisonment. Section 801 further provided:

" \* \* \* Every person so sentenced shall be held in the appropriate institution \* \* \* for and during the definite term in said sentence named, subject to parole and subject to be earlier discharged, as in this Act provided, by the Department of Public Welfare, and it shall be deemed and taken as a part of every such sentence that all of the provisions for parole and discharge in this Act contained shall be a part of said sentence as fully as though written in it.

"Every person sentenced and committed under this section 'one' shall, in the discretion of the Department of Public Welfare, be eligible to parole under rules and regulations adopted therefor by the Department of Public Welfare, such paroles to be as follows: Persons sentenced for life may be eligible to parole at the end of twenty years; persons not sentenced for life but sentenced for a definite term of years shall not be eligible to parole until he or she shall have served the minimum sentence provided by law for the crime of which he or she was convicted, good time being allowed as provided by law; nor until he or she shall have served at least one-third of the time fixed in said definite sentence. It is expressly provided that the definite sentence provided for in this section 'one' shall be applicable only to the crimes enumerated in this section 'one' and definite sentences shall not be applicable to any other crime or offense enumerated in this Act; and further, that indeterminate or general sentences shall apply to all other crimes and offenses enumerated in this Act, but not to the crimes or offenses enumerated in this section 'one.'"

Section 802, which dealt with indeterminate sentences, provided as follows: "That, except for the crimes enumerated in section one of this Act, every sentence to the penitentiary or to the reformatory for women, and every sentence or commitment to any other State institution now or hereafter provided by law for the incarceration, punishment, discipline, training or reformation of persons convicted and sentenced to, or committed to such institutions (not including, however, county jail) shall be a general sentence of imprisonment, and the courts of this State imposing such sentence or commitment shall not fix the limit or duration of such imprisonment. The term of such imprisonment or commitment shall be for not less than the minimum nor greater than the maximum term provided by law for the offense of which the person stands convicted or committed. It shall be deemed and taken as a part of every such sentence, as fully as though written therein, that the term of such imprisonment or commitment may be terminated earlier than the maximum by the Department of Public Welfare, by and with the approval of the Governor in the nature of a release or commutation of sentence or commitment."

Section 807 is as follows: "The said Department of Public Welfare shall have power, and it shall be its duty, to establish rules and regulations under which prisoners in the Illinois State Penitentiary, in the State reformatory for women and in such other State institutions as are now or may hereafter be provided for the incarceration, punishment, discipline, training or reformation of the prisoners or wards committed thereto, may be allowed to go upon parole outside of the institutional buildings and enclosures; \* \* \*."

The authority thus vested in the Department of Public Welfare with respect to paroles was in 1927 transferred to the parole board, "which shall consist of the supervisor of paroles, who shall be chairman, and six other members." Smith-Hurd Ill.Annot.Stat. ch. 127, Sec. 5.

274

Section 54a of the Civil Administrative Code, added in 1927, Smith-Hurd Stats. c. 127 § 54a, provided as follows: "The parole board created by this Act shall exercise and discharge all the rights, powers and duties heretofore vested in the Department of Public Welfare in granting paroles to persons sentenced or committed for crime or offenses, but the supervision and aftercare of persons so paroled shall remain in the Department of Public Welfare. The action of a majority of all the members of the board shall be the action of the board and no parole shall be granted except upon the concurrence of a majority of all of the members of the parole board, such concurrence to be recited in the records of the board. In consideration of any parole said board shall consider and give weight to the record of the prisoners' conduct kept by the superintendent or warden."

The parole board created in 1927 ceased to exist on July 1, 1941. By act of May 16, 1941, effective July 1, 1941, revising the Civil Administrative Code, the prison and parole functions of the Department of Public Welfare were transferred to the Department of Public Safety. Ill.Rev.Stat.1941, Ch. 127, Sec. 55a. The new statute (ch. 127, Sec. 5) provides that in the Department of Public Safety there shall be a superintendent of prisons, superintendent of paroles, superintendent of supervision of parolees, superintendent of crime prevention, state criminologist, and that these five officers shall together serve as the "division of correction." It is then provided (Sec. 55b):

"The Division of Correction in the Department of Public Safety shall exercise and discharge all the rights, powers and duties heretofore vested in the parole board and in the Department of Public Welfare in granting paroles to persons sentenced or committed for crimes or offenses and in the supervision and after-care of persons so paroled. * * * No parole shall be granted except upon the concurrence of a majority of all the members of the Division of Correction. * * *

"In consideration of any application for parole due consideration and weight shall be given to the record of the prisoner's conduct kept by the superintendent or warden. * * *"

Attention is also directed to section 45 of the act entitled "Penitentiaries" (ch. 108, Sec. 45) as follows: "The Department of Public Welfare is authorized and directed to prescribe reasonable rules and regulations for the diminution of sentences on account of good conduct, of persons heretofore and hereafter convicted of crime, who are confined in the State penal and reformatory institutions. (1872, March 19, Laws 1871–72, p. 294, § 1; 1925, June 26, Laws 1925, p. 502; § 1.)" By amendment of June 30, 1941, the same authority was given to the Department of Public Safety in lieu of the Department of Public Welfare. Laws 1941, vol. 1, p. 1011.

It is of interest to note that the original "good time" statute, as enacted March 19, 1872, contained a table of the time allowances to be granted to prisoners for good behavior (e. g., six months in the sixth year and each year thereafter). Smith-Hurd Ill.Annot.Stats., ch. 108, Sec. 45.

With this general background, we now consider what happened to George Foley. After he had served the first eleven months of his sentence, in accordance with the rules of the parole board and as a matter of routine, his case came on for hearing by the parole board. The hearing, if it may be so described, was before a subcommittee of two members of the board who came to the prison. It lasted about two minutes. Foley was asked if he had anything to say and answered, "Yes, I have something to say." One member of the subcommittee "hollered" or asked, "What about?" Foley said, "About the trial of my case." The board member said, "We don't care to hear it. That will be all." That concluded the hearing. About a month later Foley received from the clerk of the parole board a letter from Springfield, Illinois, dated October 16, 1934: "At a meeting of the parole board held October 16, 1934 the following action was taken in your case: Parole denied. October 31, 1945 Final."

There was issued to the prisoners a booklet, entitled "Rules and instructions for the government of inmates of the Illinois State Penitentiary." Since the penal institutions were then under the control of the Department of Public Welfare, the rule book must necessarily be credited to this department. In this booklet it is stated, on the subject of paroles and "good time" allowances:

"One subject is of such universal interest to prisoners that, while it does not lie strictly within the fields of the prison au-

thorities, it might be well to give a brief and clear explanation of the subject. We refer to release on parole and to the manner in which the time a prisoner must serve is figured. There are in Illinois two kinds of sentences, often called 'flat time' and indeterminate sentences. Determinate sentences are given for the crimes of murder, kidnapping and rape; most other crimes carry indeterminate sentences.

"Murder is punishable by a determinate sentence of any number of years greater than fourteen, or by imprisonment for life. In the case of any determinate sentence, a prisoner may earn statutory good time, an allowance made from his sentence, by reason of good behavior. Statutory good time is granted as follows: one month for the first year of sentence, two months for the second year, three months for the third year, and so on, up to six months for the sixth year and for every year thereafter. This good time allowance works out in such a way that you can find when you will be eligible for discharge under any definite sentence by merely dividing the number of years of your sentence by two and adding fifteen months. Thus, if you are serving fifteen years, you are dischargeable in eight years and nine months for half of fifteen is seven years and six months, and fifteen months more makes eight years and nine months. Similarly, if you have twenty-five years, you are dischargeable in thirteen years and nine months.

"Statutory good time applies to all definite sentences and may be earned, as has been said, by good behavior in prison. Serious or repeated violations of the rules may lead to the forfeiture of all good time, however. This rests with the Department of Public Welfare. Good time allowances are not a matter of right, not something that belongs to the prisoner. They are, instead, something which may be given the prisoner if he earns it.

"Release of a prisoner serving a definite sentence may also be by parole. A man under definite sentence may apply for parole at the end of one third of his sentence, provided this is not less than the minimum term fixed by law for the crime of which he was convicted. Since the minimum sentence for murder is fourteen years, a man convicted of murder cannot be paroled in less than fourteen years. If you have a sentence of fifty years, you would be eligible for parole in one third of fifty or sixteen years and eight months. You could not be discharged until the end of twenty-six years and three months. Prisoners serving definite sentences must file an application for parole hearing when they are eligible; the hearing is not granted automatically, as it is in the case of the indeterminate sentence.

"All crimes except the three mentioned are punishable by indeterminate sentences. By this is meant that the court does not set the exact number of years to be served by the prisoner, but rather sentences him to serve not less than a certain time nor more than a certain other time. Thus, for example, larceny calls for a sentence of from one to ten years. The actual time to be served by any particular prisoner under such an indeterminate sentence is fixed by the parole board when he has served his minimum term.

"When a prisoner has served the minimum period called for by his sentence, he is automatically given a hearing before the parole board. He does not need to make special application, as does the man serving a determinate sentence. He is notified of the date when his case will be considered and given an opportunity of letting his family or friends know when to appear in his behalf. A sub-committee of the parole board visits each branch of the prison, spending a week, or however long is necessary, in hearing the cases which appear that month. The first day or two are given over to interviewing friends and relatives who may wish to appear for the prisoner. Later the inmate himself is given an interview with the board members. At this interview he may present any and all facts in his favor. The members generally ask the prisoner a few questions and then give him the opportunity of saying whatever he desires.

"The actual decision on the case is not made at the sub-committee hearing, but later at a meeting attended by all the members of the parole board in Springfield. The inmate is then notified of the board's decision.

"The board may give any one of four different decisions in a given case. First, it may order the prisoner paroled. In this case, the inmate will be released on parole as soon as he secures a job and a sponsor which are approved by the board after investigation. If the inmate has a satisfactory job and sponsor available and submits the facts promptly, he is ordinarily released

about a month after the board originally grants parole.

"Second, the board may order that the prisoner serve his maximum term. This is ordinarily called 'Maximum X,' because the ticket notifying the inmate bears this marking. In such cases, the prisoner is not paroled, but will be discharged when he has completed his maximum sentence less good time. * * * Third, the board may continue a given case for any period it desires. In this event, the prisoner serves the additional time until the date set for a second hearing arrives.

"Finally, the board may order the prisoner to serve any period it desires, less than his legal maximum. Thus, suppose that you are serving a sentence of from one to ten years, and were received in June, 1939. The board may give you a six year set, that is set your time for June, 1945. In such cases, the prisoner may earn allowance for good behavior, not under the statutory good time regulations of 1872, already described, which apply only to maximum sentences, but under a ruling of the board itself, called the progressive merit system.

"If a man's conduct is good and he earns the maximum amount of time possible, he will receive an allowance of two and a half months the first year and four months every year thereafter. This is the time allowance made from final board settings. To determine how much time you must serve under such a setting, figure up the total length of the setting (from the time you were received to the date contained on your board ticket). Subtract two and a half months for the first year, and four months for each year after that. This will find your actual out date. To take our example of two paragraphs ago, if you have a six year set, you will earn two and a half months the first year, and four months each of the other five years. In other words, you will earn, altogether, twenty-two and a half months of good time. Subtract this from the six year set, and you will see that you must serve actually four years, one month, and fifteen days. If you were received, say, June 15, 1939, you will be released July 30, 1943.

"Remember that the time earned under the progressive merit system is not something which is yours by law—it is not a legal right. It is rather something you are given the opportunity to earn. It may be revoked if your conduct does not warrant its being granted."

On the subject of good time allowances, it will be observed that the foregoing rules make a differentiation between the nature and extent of the allowances on determinate sentences and the nature and extent of the allowances on indeterminate sentences. With respect to the determinate sentences, the rules follow the "good time" statute of March 19, 1872, which carried a definite schedule of time allowances. As already noted, this statute was amended June 26, 1925 (ch. 108, Sec. 45) to eliminate the statutory schedule of good time allowances and to substitute a general authorization to the Department of Public Welfare "to prescribe reasonable rules and regulations for the diminution of sentences on account of good conduct." Under the 1925 statute, undoubtedly, the Department of Public Welfare had authority to make the rules and regulations concerning good time allowances which appear in the prison rule book. Under these rules, the allowances on determinate sentences are called "statutory good time," while the allowances on indeterminate sentences are called "progressive merit system." The allowances on determinate sentences run up to six months per year in the sixth year and each subsequent year, whereas the allowances on indeterminate sentences are two and a half months for the first year and four months for each subsequent year. No special significance can be attached to the words "statutory good time." All good time allowances are statutory, in the sense that the authority to grant the good time allowances is derived from section 45 of the Penitentiaries Act. Even when the rules talk about "statutory good time," the qualification is made that the good time must be earned by good behavior in prison. "Serious or repeated violations of the rules may lead to the forfeiture of all good time, however. This rests with the Department of Public Welfare. Good time allowances are not a matter of right, not something that belongs to the prisoner. They are, instead, something which may be given the prisoner if he earns it." Substantially the same thing is said with respect to good time allowances under the so-called progressive merit system: "Remember that the time earned under the progressive merit system is not something which is yours by law—it is not a legal right. It is rather something you are given the opportunity to earn. It may be revoked if your conduct does not warrant its being granted."

By applying the foregoing rules to the order made by the board October 16, 1934, it is found that Foley by his good conduct credits and "hard quarry labor" earned the maximum good time allowance under the progressive merit system and thereby his "final" of October 31, 1945, was fully served by December 15, 1941, at which time —in accordance with the rules and the established procedure—he should have been released on parole as a matter of course, without further hearing or appearance before the parole board.

As already appears, the parole board went out of existence July 1, 1941. At no time from October 16, 1934, to July 1, 1941, did the parole board take any further action in Foley's case. But on November 14, 1941—without prior notice or hearing—there came to Foley from Springfield, Illinois, a letter from the clerk of the newly-created division of correction as follows: "At a meeting of the division of correction held today, the following action was taken in your case: outlist not approved. Continued to October 31, 1948."

What was the effect of the action taken by the old parole board on October 16, 1934? Shall the order then made by the board be taken to mean exactly what it says, or shall it be taken merely as an ironical jest? The respondent urges that under the decision of the Supreme Court of Illinois in People ex rel. Michaels v. Bowen, 367 Ill. 589, 12 N.E.2d 625, the order of the parole board may be completely disregarded. The respondent says that on December 15, 1941, when Foley should have been released pursuant to the order of the parole board, he had not yet fully served the sentence imposed upon him by the Circuit Court of Sangamon County, therefore it was not unlawful to continue to hold him as an inmate of the Illinois State Penitentiary. The respondent, who bears no personal blame for Foley's predicament, may admit that it was a cruel jest to dangle before the inner vision of Foley for eight long years the lure of good time allowances for meritorious conduct and hard labor, only to dash his hope at the end of the time, but the respondent urges that this court is powerless to do anything about it.

The court is not convinced, however, that it lacks the power to end the spiritual torture to which George Foley has been subjected. First of all, the respondent assumes that the Circuit Court of Sangamon County sentenced Foley to serve a life sentence. The court did not sentence Foley for life, but for the indeterminate term of one year to life, which is a radically different sentence. The indeterminate sentence of one year to life carried with it, by force of statute, the authority of the parole board to end the imprisonment by grant of parole at any time not less than the minimum of one year. The true nature of the sentence cannot be disregarded without impugning the intelligence and humanity of the trial judge.

There are at least two basic points of distinction between the Michaels case and the present case, as follows:

(1) Foley has been an "A" grade prisoner at all times since his incarceration. No cause has arisen at any time to reconsider or revoke any part of his good time allowances. From October 16, 1934, when the parole board order was made, until November 14, 1941, when the parole board order was cancelled by the newly-created division of correction, no cause arose by reason of Foley's conduct to reconsider or revoke the parole board order of October 16, 1934. Michaels began serving his sentence (an indeterminate sentence of one year to life) on October 14, 1929. October 19, 1930, the parole board gave Michaels a "final" of October, 1939. November 23, 1934, for reasons then deemed sufficient by the parole board (whether or not the reasons were in truth valid), the parole board declared Michaels an "escape" and demoted him from grade "A" to grade "E". Thereupon, February 13, 1935, the board revoked its order of October 19, 1930. January 16, 1936, the parole board was notified by the penitentiary authorities that Michaels had been restored to grade "A", effective as of April 14, 1930 (presumably, the date when Michaels was originally classified as a grade "A" prisoner). Then, in February, 1936, the parole board gave Michaels a new "final" of October 14, 1941. The opinion of the Supreme Court of Illinois in the Michaels case does not state when the petition for habeas corpus was filed in that court, but the opinion of the court was rendered December 15, 1937. The petition urged: (1) That by virtue of the parole board's order of October 19, 1930, fixing the "final" of October, 1939, and by virtue of good time earned, Michaels' sentence was fully served by July 29, 1936; (2) that the parole board unlawfully and without any authority changed

the "final" from October, 1939 to October, 1941. It was not claimed that Michaels was entitled to release under the second "final," fixed by the board's order of February 1936.

Thus, the Michaels case—dictum and loose language aside—turned solely on the force and effect of the parole board's order of October 19, 1930, revoked by the board itself on February 13, 1935, after Michaels had been demoted (wrongfully or rightfully) from grade "A" to grade "E". All that was necessary to decide the case was to answer the single question: "Did the parole board have authority on February 13, 1935, under the circumstances then existing, to revoke its order of October 19, 1930?" Undoubtedly, somewhere in the opinion of the court there lurks an affirmative answer to this question. For the rest, since there was no issue before the court on an alleged right to a release under the board order of February, 1936, setting the "final" of October 14, 1941, the Michaels case is not a direct precedent governing the case at bar.

In appraising the foregoing point of distinction between the Michaels case and the present case, certain fundamental propositions must be kept in mind. In the opinion of the Supreme Court of Illinois there is a play upon the word "sentence." When the parole law was originally enacted, one of the points upon which the constitutionality of the law was challenged was that it shifted from the court to the Department of Public Welfare (or later, the parole board) the duty or responsibility of imposing on the accused a definite sentence. The Supreme Court of Illinois answered this challenge in People v. Joyce, 246 Ill. 124, at page 137, 92 N.E. 607, at page 613, 20 Ann.Cas. 472: "It is further contended that said provisions of said sections 1 and 6 are repugnant to the constitutional provision as to due process of law; that due process of law requires that the court fix a definite punishment in sentencing the accused. Due process of law was fully discussed in People v. Strassheim, supra [242 Ill. 359, 90 N.E. 118], and that discussion need not be here repeated. The right to have the court fix the amount of punishment is no more a fundamental right than it is to have the jury fix it, and it was held in People v. [Illinios] State Reformatory, supra [148 Ill. 413, 36 N.E. 76, 23 L.R.A. 139], that the latter was not a fundamental right. The contention of the plaintiff in error cannot be upheld that under the common law the court fixed the punishment in all cases in which the jury did not fix it. Hale's Pleas of the Crown, 11; 4 Blackstone's Com. 237. Under the parole act the court is not given any discretion in fixing the punishment, and can therefore exercise none. Under the act it sentences to imprisonment, but that is not all of the sentence. The provisions of the parole act are incorporated into the sentence by virtue of law, and become a part of it as much as if the provisions were actually written into it."

The statute says, with respect to crimes punishable by indeterminate sentence, that the sentence shall be "a general sentence of imprisonment" and that "the courts of this State imposing such sentence or commitment shall not fix the limit or duration of such imprisonment." Ch. 38, Sec. 802. No discretion is left to the court; it is absolutely mandatory upon the court to impose only "a general sentence of imprisonment." Then further: "It shall be deemed and taken as a part of every such sentence, as fully as though written therein, that the term of such imprisonment or commitment may be terminated earlier than the maximum by the Department of Public Welfare, by and with the approval of the Governor in the nature of a release or commutation of sentence or commitment."

Despite the explicit language of the statute and despite what was said by the court in upholding the constitutionality of the statute (as above quoted), the Supreme Court of Illinois has repeatedly declared that the sentence of the court is to be considered as a definite sentence for the maximum period of the indeterminate sentence. The trial court is deprived of authority to "fix the limit or duration of such imprisonment." The administrative agency is given sweeping authority to terminate the imprisonment at any time between the minimum and the maximum. The only way in which the maximum, as fixed in the court's sentence, could actually become a definite sentence of imprisonment, in lieu of "a general sentence of imprisonment," is by inaction of the administrative agency, that is, a complete failure of the administrative agency to perform the duty imposed upon it by law. Short of such default, the maximum specified in the sentence imposed by the court could become the actual maximum only by an express order to that effect made by the administrative agency. Thus, if

mere play upon words is to be avoided, the truth is that the parole law takes away from the court the power to impose imprisonment beyond the minimum and vests in the parole agency the sole power to control the duration of the imprisonment after the minimum time has been served.

Next, the statute expressly confers on the parole agency authority to establish rules and regulations under which paroles shall be granted. Ch. 38, Sec. 807. This rule-making power was expressly upheld by the Supreme Court of Illinois, against challenge of unconstitutionality, in People v. Roth, 249 Ill. 532, 94 N.E. 953, Ann.Cas. 1912A, 100. It is undisputed on the record of this case that everything done by the parole board in the case of George Foley was done in accordance with the rules and regulations in force at the time the action was taken.

In dealing with an indeterminate sentence of one year to life the board had authority, beyond question, to wait eight years and then forthwith to release the prisoner on parole. Or, after deciding that the actual term of imprisonment should be eight years, the parole board certainly had authority to notify the prisoner a day in advance, a week in advance, or a month in advance that he would be released on parole on a certain date. The case is precisely the same, as a matter of logic and as a matter of law, when the parole board says to the prisoner on October 16, 1934: "We have decided that you shall be released or paroled October 31, 1945, but if you earn the maximum good time credits you will actually be paroled on December 15, 1941." It cannot be contended that such procedure was unlawful or illogical; or that rules and regulations calling for such procedure could not lawfully be made by the Department of Public Welfare under the rule-making authority granted by the statute. Without procedure of this kind no practical effect could be given to the "good time" statute, in relation to indeterminate sentences.

Coming to the third basic proposition, that the "good time" allowances are a matter of right, not merely a matter of grace, in case of good behavior: Formerly, the statute carried its own schedule of "good time" allowances. From June 26, 1925, until July 1, 1941, the authority "to prescribe reasonable rules and regulations for the diminution of sentences on account of good conduct" was vested in the Department of Public Welfare. Now it is vested in the Department of Public Safety. When the administrative agency makes rules and regulations for allowance of "good time," pursuant to command of the statute, such rules and regulations are binding until changed. In a matter affecting personal liberty, no state agency can act purely by caprice. The 14th amendment forbids arbitrary action by the state, through its agencies and officers, in derogation of personal liberty. Further, the 14th amendment demands the equal protection of the laws; therefore, the administrative agency of the state cannot proceed in a discriminatory manner.

With these fundamental principles in mind, the true meaning of the Michaels case must be that a "final" setting of time, such as that made by the parole board in the Foley case on October 16, 1934, did not preclude the board from afterwards reconsidering its action if misbehavior of the prisoner gave cause for cancellation of his "good time" allowance; or if misconduct of the prisoner gave cause for reconsideration of the "final" setting of time for his release; but not that the parole board could arbitrarily ignore its own order and the rules and regulations applicable thereto, with no change in the status or condition of the prisoner warranting such reconsideration.

(2) The second point of differentiation between the Michaels case and this case is that in the Michaels case the first order of October 19, 1930, and the countermanding order of February 13, 1935, were both made by the parole board, whereas in this case the first order was made by the parole board which went out of existence July 1, 1941, without acting further on the Foley case, and the countermanding order was made by an entirely new agency, not given any authority to fix Foley's actual term of imprisonment by the judgment order of the Circuit Court of Sangamon County and the statutes then in effect regarding the indeterminate sentence.

While the act of May 16, 1941, (ch. 127, Sec. 55b), gave to the division of correction in the Department of Public Safety "all the rights, powers and duties heretofore vested in the parole board and in the Department of Public Welfare in granting paroles", this did not confer authority upon the new agency arbitrarily to annul the order made by the parole board October 16, 1934, without cause of any

kind. It may be conceded, perhaps, that if there had been cause for reconsideration of the case, under the rules governing the order of the parole board at the time it was made, and that if there had been a reconsideration of the case on notice and hearing, the new agency might have exercised jurisdiction in place of the defunct parole board, but there was no cause under the rules for a reconsideration of the case, no notice or hearing, merely the unexplained cancellation by the new agency of the lawful and valid order of the former agency.

The Supreme Court of Illinois, in the recent case of People ex rel. Day v. Lewis, 376 Ill. 509, 34 N.E.2d 712, 713, did not hesitate to entertain a petition for a writ of habeas corpus on the claim that the Department of Public Welfare had acted arbitrarily and had abused its discretion in forfeiting Day's "good time" and thereby compelling him to serve the maximum of his indeterminate sentence of one to ten years. The court concluded, upon consideration of the facts, that the action of the administrative department was taken in conformity with its own rules and was warranted by Day's infractions of the prison rules, therefore remanded the relator to the custody of the warden. But on the question of jurisdiction, the court said as follows: "The respondent challenges the jurisdiction of this court contending that the granting or withholding of credit for good behavior is within the exclusive power of the executive department, and that its decisions are immune to judicial review. The allegations in relator's petition, that his earned good time has been forfeited arbitrarily, conferred upon this court jurisdiction to determine whether or not administrative discretion has been abused. People v. Hill, 344 Ill. 246, 176 N.E. 360."

This case is the converse of the Day case. Foley committed no infractions of the prison rules which merited or resulted in forfeiture of any of the "good time" earned by him, therefore it was an arbitrary abuse of discretion on the part of the division of correction to forfeit his good time, either directly or indirectly (i.e., by disapproving the "outlist" on which Foley's name then appeared and continuing his case to October 31, 1945). Be it noted, incidentally, that although Day was serving an indeterminate sentence of one to ten years the court referred to his "good time"

allowance, which had been forfeited, as "statutory good time."

The order of the parole board made in Foley's case on October 16, 1934, was a lawful and valid order under the rules then governing the granting of paroles. The parole law gave to the parole board unquestionable authority to fix the actual maximum term of imprisonment to be served by Foley. The Department of Public Welfare, of which the parole board was a subagency, had unquestionable authority—indeed a positive statutory mandate—to provide for "good time" allowances on all sentences of imprisonment whether determinate or indeterminate. To give practical effect to the "good time" statute, in the case of Foley's indeterminate sentence, the parole board gave him his "final" of October 31, 1945. By virtue of that order, the "good time" statute and the rules made by the Department of Public Welfare under both the parole statute and the "good time" statute, Foley's maximum was fully served December 15, 1941, and he should then have been released. His detention since that time has been unlawful. In this phase of the case, this court is not called upon in any manner to question the judgment entered by the Circuit Court of Sangamon County, but only to determine whether or not that judgment has been fully satisfied. Such a question is cognizable on application for release on writ of habeas corpus. People v. Eller, 323 Ill. 28, 32, 153 N.E. 597, 49 A.L.R. 490; People v. Siman, 284 Ill. 28, 36, 119 N.E. 940; People v. Hill, 344 Ill. 246, 251, 176 N.E. 360; (also, in effect, People ex rel. Day v. Lewis, 376 Ill. 509, 34 N.E. 2d 712).

The court does not find it necessary to decide the question presented by the petitioner with respect to the alleged invalidity of the judgment of the Circuit Court of Sangamon County.

On the second proposition presented by the petitioner, namely, that the administrative agencies of the State of Illinois have deprived him and are now depriving him of his liberty without due process of law and merely by the arbitrary use or abuse of State power, the court holds with the petitioner. In the administration of the parole and good time statutes of the State of Illinois, Foley has been denied the equal protection of the laws guaranteed by the Fourteenth amendment.

An order of discharge has been made.