Edward Morgan MacKENNA, Appellant,

v.

O. B. ELLIS, Director, Texas Department of Corrections, Appellee.

No. 18110.

United States Court of Appeals Fifth Circuit.

June 22, 1960.

Cameron, Circuit Judge, dissented.

594

Martin L. C. Feldman, New Orleans, La., Edward Morgan MacKenna, in pro. per., Huntsville, Tex., for appellant.

John L. Estes, Linward Shivers, Tom I. McFarling, Asst. Attys. Gen. of Texas, Will Wilson, Atty. Gen. of Texas, B. H. Timmins, Jr., Asst. Atty. Gen. of Texas, for appellee.

Before RIVES, Chief Judge, and CAMERON and WISDOM, Circuit Judges.

WISDOM, Circuit Judge:

This case is before us for the second time on an appeal from a denial of the writ of habeas corpus. See MacKenna v. Ellis, 5 Cir., 1959, 263 F.2d 35.

Edward MacKenna was sentenced to eight years' imprisonment for the theft of a camera valued at $250. Since March 12, 1956, he has been confined in the Dallas County Jail and in the Texas Penitentiary.

MacKenna is an educated man, a graduate of Northwestern University in 1934.

He has worked as a reporter for a number of newspapers and has been a feature writer for several periodicals. But Edward MacKenna has seven convictions for crimes. He attributes his commission of these crimes to his having been an alcoholic. Since 1953 he has been a member of Alcoholics Anonymous.

Consistently, vigorously, and for the most part on his own, MacKenna has asserted that he did not steal the camera. His story is that at the Dallas State Fair in October 1955 he came into possession of the camera inadvertently.[1] An acquaintance whom he had known in the Texas Penitentiary left it at one of the stands on the midway where both had been sitting. MacKenna picked it up with the intention of returning it. Somewhat later he discovered the name and address of a commercial photographer on the camera case, making him realize that he had stolen property on his hands. This presented a serious problem: MacKenna was on a Governor's pardon from the Texas Penitentiary at the time. He was afraid to return the camera, as an honest man might, for fear that he would be accused of the theft. After several days of searching thought, so he says, he decided to place the camera in a rental locker and mail the key to the owner. November 3, 1955, he brought the camera to the Union Bus Terminal in Dallas, placed the camera in a locker, pocketed the key, and stepped into an adjacent drugstore to buy a special delivery stamp. Upon leaving the drugstore, he was arrested by two Dallas policemen, one of whom knew him by sight and name. He was searched. The locker key was found. The policemen opened the locker, found the camera, took MacKenna to the Dallas

1. There is confusion as to the date of MacKenna's visit to the State Fair. The evidence is undisputed that the camera was stolen the afternoon of October 18, 1955, from an automobile parked at the State Fair. According to the original record, MacKenna testified that he came into possession of the camera Sunday, October 13, 1955. In the earlier MacKenna case, Judge Hutcheson, dissenting, pointed out the discrepancy in dates as evidence of MacKenna's untruthful-

ness. In the hearing below, MacKenna insisted that "October 13" was a typographical error. MacKenna's former wife, in her deposition, stated that she picked up MacKenna every afternoon after work, including the afternoon of October 18, 1955, and that the only time he or they were at the State Fair was on a Sunday. October 13, 1955 was a Thursday. October 18, 1955 was a Tuesday.

Jail, and booked him for the theft of the camera.

█ This, of course, may be just another likely story. Then again, MacKenna may be a victim of circumstances. Likely or unlikely, it is basic to due process that an accused person have a fair opportunity to tell his story in a fair trial. He is entitled to such notice of trial that he will be able to present his witnesses in court on the day of the trial. He is entitled to the effective, whole-hearted assistance of counsel and to the undivided loyalty of counsel. Finally, he is entitled to have his trial guided by a judge sensitive to the duty of protecting the accused's constitutional rights in all cases, but especially in a case when fledgeling lawyers are appointed counsel over the protest of the accused.

MacKenna was committed to the Dallas County Jail on March 12, 1956. Three times in the next six months, in April, May, and July, his name appeared on the official court docket for appearance to answer the indictment. Without apparent reason and without any explanation he was not taken into court on any of these occasions.

Friday, September 28, 1956, after six months and seventeen days in the county jail, MacKenna, for the first time, was taken to court. The district judge asked if he had counsel. MacKenna replied that he was negotiating with a Mr. Ben Henderson to represent him; at the hearing below he testified that he had managed to get together $150 for a retainer, and that Mr. Henderson had agreed to go by the jail and see him in late September. The trial judge stated that he did not see Mr. Henderson in court and that he was

then and there appointing counsel to represent the defendant.[2] He appointed two young attorneys just out of law school.

An important issue in the case is whether MacKenna objected to the appointment of counsel. His appointed counsel, who were present in court, state that he did not object; at least, not in their presence. Exception I of the formal bills of exception filed in the state court appellate proceedings states, in part:

"The Court asked defendant if he had counsel to represent him. Defendant replied he was negotiating with counsel of his own choice to handle the case. The Court then informed defendant that it was appointing counsel, and, *over protest*, proceeded to do so. Then and there, in open Court, the *defendant took exception to the action.*"

The bills of exception were submitted to counsel for the state and certified as correct by the trial court.

MacKenna's trial was set for Wednesday, October 3, 1956. A week-end therefore intervened between his appearance on Friday, September 28, and the day of his trial. About 10:30 Tuesday morning, October 2, 1956, he was brought into court. He was told that his case had been advanced a day on the docket and that his trial was about to begin. That was his notice of trial. Within fifteen minutes to half an hour the trial began. No witnesses were put on the stand however until 2:00 P. M.

MacKenna protested against being put to trial in advance of the date set for trial, because of inability to reach his witnesses. He asked his attorneys to

2. At the time of the trial, Texas courts held that due process required the appointment of counsel only in capital cases; in contested cases involving non-capital felonies appointment of counsel was left to the discretion of the trial judge. See Holton v. State, 1942, 143 Tex.Cr.R. 415, 158 S.W.2d 772, certiorari denied 316 U.S. 703, 62 S.Ct. 1311, 86 L.Ed. 1771; Moore v. State, Tex.Cr.App.1959, 324 S.W.2d 879, requires appointment of counsel in all felony cases.

Generally, "his right [an accused] to be heard through his own counsel [is] unqualified". Chandler v. Fretag, 1954, 348 U.S. 3, 9, 75 S.Ct. 1, 5, 99 L.Ed. 4. In MacKenna v. Ellis, 5 Cir., 1959, 263 F.2d 35, 40, we held: "Here, however, more than six months after his arrest and when there was no claim that he was prevented from communicating with counsel, he had reached only the negotiating stage. It was not error for the court to proceed without such counsel."

move for a continuance. They told him that they had done so, in a conference with the judge, and that his trial had to be held on October 2 because another case originally scheduled for October 2 had to be postponed. According to MacKenna, he told the trial judge that he had given the names and addresses of witnesses to his attorneys and that they had not summoned any witnesses. MacKenna himself then asked the court for a delay of at least one day, and he would try to reach the witnesses by telephone. The court denied the request and instructed MacKenna to let his attorneys handle it. MacKenna asserts that his attorneys then made several telephone calls, but none of the witnesses were available on such short notice. His attorneys denied having made any telephone calls, except for one call to a character witness, in the afternoon, after MacKenna had taken the stand.

The record does not show that the attorneys formally applied for a continuance and in the hearing below they testified that no motion for a continuance was presented. However, Exception II filed in the state court proceedings reads:

"Exception II

"Two court days after appointment of counsel, above, defendant was taken back to court on October 2, 1956, and advised his trial had

been 'moved up' because of postponement of another trial, and that he was to be tried forthwith.

"*Defendant protested* he had not had time to contact the witnesses who wished to appear in his defense, and asked for a continuance. Defendant has never theretofore asked for a continuance in the cause. The defense counsel appointed by the Court advised defendant they had moved for continuance, but that the Court had overruled the motion.

"*Then and there, in open Court defendant excepted.*"

It is clear that the application for a continuance failed to comply with the procedural requirements established in Article 543 of the Texas Code of Criminal Procedure.[3] It is clear that the bill of exception was defective. "The bill [of exceptions] must disclose further the reasons assigned and must set out the application." 4 Tex.Jur. App. and Error —Criminal, p. 365, Section 246 and cases cited.

MacKenna was the only witness to testify for the defense. He was found guilty and sentenced to eight years imprisonment. His attorneys bowed out, although they did offer to appeal, and MacKenna himself prepared a motion for a new trial, alleging that he had new evidence. MacKenna attached to his motion

3. Article 543, Texas Code of Criminal Procedure, reads: "Art. 543. [608] [597] First application by defendant—1 In the first application by the defendant for a continuance, it shall be necessary, if the same be on account of the absence of a witness, to state: 1. The name of the witness and his residence, if known, or that his residence is not known. 2. The diligence which has been used to procure his attendance; and it shall not be considered sufficient diligence to have caused to be issued, or to have applied for, a subpoena, in cases where the law authorized an attachment to issue. 3. The facts which are expected to be proved by the witness, and it must appear to the court that they are material. 4. That the witness is not absent by the procurement of consent of the defendant. 5. That the application is not made for delay. 6. That there is no

reasonable expectation that attendance of the witness can be secured during the present term of court by a postponement of the trial to some future day of said term. The truth of the first, or any subsequent application, as well as the merit of the ground set forth therein and its sufficiency shall be addressed to the sound discretion of the court called to pass upon the same, and shall not be granted as a matter of right. If an application for continuance be overruled, and the defendant convicted, if it appear upon the trial that the evidence of the witness or witnesses named in the application was of a material character, and that the facts set forth in said application were probably true, a new trial should be granted, and the cause continued or postponed to a future day of the same term."

the affidavits of a number of witnesses who would have testified in his favor had they been given more notice and had the case been continued. His wife would have testified as to his whereabouts the afternoon and night of the alleged theft. June Chapman, his company's bookkeeper, would have identified his time card showing that he was at work the day of the theft. Ward B. Chandler, an official of the company employing MacKenna, would have testified that he was at work the day the theft is supposed to have occurred. Dr. John F. Anderson, Jr., Pastor of the First Presbyterian Church of Dallas, Major Kenneth E. Moses, Volunteer Parole Supervisor for the County of Dallas, Salvation Army, and Mr. William Dalton, Parole Officer for the County of Dallas, would have testified as to MacKenna's character, home life, and adjustment in society. A new trial was denied; of course, none of MacKenna's "new evidence" was new evidence in a legal sense.

Acting for himself, MacKenna perfected an appeal to the Court of Criminal Appeals of Texas. That court affirmed the judgment of the trial court, April 3, 1957. MacKenna v. State, 1957, 164 Tex.Cr.R. 623, 301 S.W.2d 657. The opinion of the court did not deal with Exception I. The court held, as to Exception II: "While Bill of Exception No. II certifies that on the day the case proceeded to trial appellant 'protested he had not had time to contact the witnesses who wished to appear in his defense and asked for a continuance', the bill is insufficient as the application for continuance is not shown therein." MacKenna v. State, 1957, 164 Tex.Cr.R. 623, 301 S.W.2d 657, 658. The result was inevitable under Texas law. Pena v. State, Tex.Cr.App., 1 S.W.2d 1095; Williams v. State, 115 Tex.Cr.R. 574, 27 S.W.2d 217 and Chavez v. State, 147 Tex. Cr.R. 423, 181 S.W.2d 85.

MacKenna then filed an application for a writ of habeas corpus in the trial court. On its denial, he filed a petition for a writ of certiorari with the United States Supreme Court. This too was denied, August 14, 1957, MacKenna v. State of Tex., 355 U.S. 871, 78 S.Ct. 70, 2 L.Ed.2d 55, rehearing denied 355 U.S. 886, 78 S.Ct. 152, 2 L.Ed.2d 116.

On October 31, 1957, the Texas Court of Criminal Appeals denied MacKenna's petition for writ of habeas corpus. The same court also denied a rehearing. Appellant next filed for writ of habeas corpus in the United States District Court for the Southern District of Texas, Houston Division. In a memorandum and order rendered January 28, 1958, the district judge refused to grant the writ of habeas corpus, or to enter an order to show cause, or to issue a certificate of probable cause. MacKenna then perfected his appeal to this Court. January 16, 1959, we remanded the case to the district court. The United States Supreme Court denied the appellee's petition for a writ of certiorari. Ellis v. MacKenna, 1959, 360 U.S. 935, 79 S.Ct. 1453, 3 L.Ed.2d 1546.

In our earlier MacKenna decision we held that the appellant was entitled to a hearing on the truth or falsity of his allegations (1) that he was forced, over his objections, to accept representation of counsel appointed by the court and (2) that he was given no reasonable opportunity to secure the presence and testimony of his witnesses.

August 6, 1959, the district court held a hearing on this case and denied MacKenna's application for a writ of habeas corpus. The case is now before us on appeal from that determination.

### I.

On the question of the appointment of counsel for MacKenna, the trial judge held that the two lawyers "were not appointed over his objection". He found:

"The evidence is that before these lawyers were appointed that MacKenna beckoned to them and they went over and talked to him in the courtroom in Dallas County, that later that same morning they were appointed to represent him. It is the testimony of the lawyers that he

did not protest, that he made no objection to their appointment.

"The testimony of the lawyers is they did confer with him, they advised with him, and at least some of their advice he did not accept, which of course he was under no obligation to accept."

This finding is clearly erroneous in failing to give effect to the conclusiveness of a bill of exception in its recital of facts. Bill of Exception I sets out unequivocally that the trial judge appointed counsel "over protest" of MacKenna and that "then and there, in open court, the defendant took exception to the action".

A bill of exceptions is defined as follows: "A Bill of Exception is a written objection to the ruling of a court on a point of law, properly certified by the judge who made the ruling. It shows what occurred in the trial court, and perpetuates in the record the ruling of the court to which objection is made. It incorporates into the record matters that would otherwise not be part thereof, and presents to the appellate court a true recitation of the matters presented to the trial court and the rulings of that court." 4 Tex.Jur.2d 23, App. and Error—Civil, Section 489. (The Rules of Civil Procedure are applicable to bills of exception in criminal cases in Texas). When a bill of exception is presented to a trial judge, he is required to approve it if it is correct. If he feels that it is not correct, he may make suggested corrections with the approval of the parties. If the parties fail to agree, the trial judge must draw another bill, and if the party who presented the original bill is still not satisfied, he may have his bill verified by bystanders. But the trial judge must certify the bill of exception if it states the facts as they actually occurred during the trial. See 5 Tex.Jur. 2d, App. and Error—Criminal, Sections 175–178.

Numerous Texas decisions hold that a certificate of approval by the trial judge of a bill of exception conclusively establishes that the facts as recited in the bill actually occurred. Courts are not at liberty to look beyond the bill to determine the correctness of the recitals. Howard v. State, 77 Tex.Cr.R. 185, 178 S.W. 506; 5 Tex.Jur.2d 518, App. and Error—Section 319. The rationale for the rule is stated in Banks v. State, 1923, 95 Tex.Cr.R. 384, 254 S.W. 962, 963:

"Great care should be exercised by trial judges in the examination of bills of exception, to see that they reflect proceedings as they occurred. The general rule adhered to by this court is that we accept the statements in bills of exception in preference to those appearing in the statement of facts, upon the hypothesis that the attention of the trial court had been specifically directed to the facts contained in such bills of exception, and that they have the approval of the court below after critical examination."

See Ticer v. State, Tex.Cr.App.1958, 313 S.W.2d 301 (established fact that motion for mistrial was made);[4] McCollum v. State, 1950, 155 Tex.Cr.R. 219, 233 S.W. 2d 493 (certificate of approval established fact that motion for instructed verdict was made); Gonzales v. State, 1929, 113 Tex.Cr.R. 122, 18 S.W.2d 618; Barnett v. State, 1929, 112 Tex.Cr.R. 532, 17 S.W.2d 831; Benavides v. State, 1929, 112 Tex.Cr.R. 52, 14 S.W.2d 67 (established fact that request for special charge was made); Sims v. State, 1929,

4. In Ticer v. State, Tex.Cr.App.1958, 313 S.W.2d 301, a certified bill of exception recited that a motion for mistrial was made and overruled. The issue was whether the certification was binding. The court held that the trial judge's certificate of approval established that such a motion was made and that it was binding: "In the case at bar, the bill of exception recites that a motion for mistrial was made and was by the trial court overruled. When the trial court approved this bill of exception, *he certified that just that and nothing more had occurred.* He did not certify that the allegations in the motion were correct or that the events set forth therein had in fact occurred." (Emphasis added.)

111 Tex.Cr.R. 345, 13 S.W.2d 98; [5] Knox v. State, 1929, 111 Tex.Cr.R. 601, 13 S.W.2d 378; [6] Estell v. State, 1922, 91 Tex.Cr.R. 481, 240 S.W. 913 (established motion for postponement). See Rousey v. State, 1928, 110 Tex.Cr.R. 33, 7 S.W. 2d 557; Elkins v. State, 1923, 101 Tex. Cr.R. 377, 276 S.W. 291. See 5 Tex.Jur. 2d, Section 319, p. 518.

It is significant that the certification of the Criminal District Court, attached to the bills of exception, states that Mac-Kenna's bills of exception were "examined by [the Court] *and having been submitted to counsel for the state,* the same are found to be correct and are hereby allowed, signed and ordered filed as part of the record".

Since under Texas law there can be no question as to MacKenna's in fact having protested the appointment of counsel, the first question boils down to whether, in the unusual circumstances of this case, the trial judge offended due process in appointing counsel, over the protest of the accused.[7]

■ We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance. We consider undivided loyalty of appointed counsel to client as essential to due process.

We do not doubt the propriety of a trial judge's appointing an attorney for the defense over the protest of the accused when the accused lacks the intelli-

gence or the education to handle his own defense. Here, however, as we said in the earlier opinion:

"The defendant, being sui juris and mentally competent, had a right to rely on his own skill and ability and to conduct his defense in person without the assistance of counsel; and the court was not justified in imposing assigned counsel on the defendant against his will. Clearly, we think, it would be a denial of due process of law for the court to refuse to permit the accused, sui juris and mentally competent, to defend himself and, instead, require him to accept the services of inexperienced and incompetent counsel, as is alleged in the petition for habeas corpus. The appellant is entitled to a hearing to ascertain the truth or falsity of such allegations." Mac-Kenna v. Ellis, 5 Cir., 1959, 263 F.2d 35, 40–41.

The record of the hearing below reinforces the view expressed in the earlier opinion. One of the appointed lawyers had received his license to practice law just three weeks before he was appointed counsel for the accused. The other appointed lawyer had been practicing five months. They had had one case. In that case their client pleaded guilty to a narcotics charge.

At the very time of their appointment as MacKenna's counsel each of the young lawyers had on file with the Dallas County District Attorney's Office a request for employment. Several months later both

5. In Sims v. State, 1928, 111 Tex.Cr.R. 345, 13 S.W.2d 98, 99, the court said: "Appellant insists, on motion for rehearing, that we erred in holding that it was not necessary under the facts of the instant case for the state to elect upon which of two proven transactions it asked for a conviction. There is some conflict between the bill of exception presenting the matter and the statement of facts. We are bound, however, in such case, by the bill of exception approved by the judge."

6. In Knox v. State, 1929, 111 Tex.Cr.R. 601, 13 S.W.2d 378, 379, the court said:

"It is difficult for this court to believe that these bills speak the facts, but we are compelled to accept them as so doing, since in plain words the trial judge has approved as true the facts set out in each of said bills."

7. At the trial below MacKenna's attorney seemed to think that the only issue was whether the refusal to grant a continuance was a deprivation of due process. The question of the appointment of effective counsel, however, was briefed and argued by both parties.

were employed by the Dallas District Attorney. At the time of the hearing below one was still in the employ of the District Attorney's Office. The other, now an office attorney for an insurance company, testified that in October, 1956, he and his co-counsel "were sort of practicing on our own when we were waiting for an opening in the District Attorney's Office". We feel certain that these young men were well intentioned. But their inexperience and the conflict of interest created by their filing an application for employment in the District Attorney's Office prevented their defending MacKenna with the vigor and the undivided dedication to their client's cause to which any accused person is entitled. "The right to assistance by counsel means effective assistance by an attorney who gives the accused his complete loyalty and whose service is of such character as to preserve the essential integrity of the proceedings." In re York, Okl.Cr. 1955, 283 P.2d 567, 570, certiorari denied; York v. McLeod, 1955, 350 U.S. 839, 76 S.Ct. 78, 100 L.Ed. 749.

In view of their relationship with the District Attorney, it is not surprising that they were willing to accommodate him by agreeing to the short notice of trial and to the advance in the trial date without notice. In the hearing below, the attorneys were questioned as to whether they recalled the reason for the case's being moved up to October 2. One answered: "Not definitely, no. It was just —the State's Attorneys, Mr. Montgomery and Judge McCormack wanted the case tried on that date." The other answered:

"As best I recall they had another case they wanted to try and we didn't see any reason in having it postponed since we hadn't planned on producing any character witnesses and there were no fact witnesses available to us."

The young men appointed as counsel were licensed lawyers and graduates of good law schools. No doubt, today, they are excellent lawyers. Their lack of vigor in conducting MacKenna's defense and their mistakes did not show up, of course, until *after* their appointment. But a trial judge who appoints fledgeling attorneys as defense counsel, over the defendant's protest, cannot wash his hands of their mistakes.[8] Fundamental fairness to a person accused of crime requires such judicial guidance of the conduct of a trial that when it becomes apparent appointed counsel are not protecting the accused the trial judge should move in and protect him.

Here, in the first place, the appointed counsel made no objection to the short notice of trial. Then they made no objection to the trial's being pushed up from Wednesday to Tuesday. They admitted asking for a continuance in a private conference with the trial judge, but did not file a formal motion for a continuance. The bill of exception shows that MacKenna himself, with his lawyers present in court, asked for a continuance. The bill also shows that his layman's request for a continuance plainly does not comply with the requirements of the Texas Code of Criminal Procedure. The bill was defective in failing to set forth the reasons assigned and the application

8. Hawk v. Hann, D.C.Neb.1952, 103 F. Supp. 138; United States ex rel. Foley v. Ragen, D.C.Ill.1943, 52 F.Supp. 265; United States ex rel. Hall v. Ragen, D. C.Ill.1945, 60 F.Supp. 820. See also Sanchez v. State, 1927, 199 Ind. 235, 157 N.E. 1; State v. Keller, 1929, 57 N. D. 645, 223 N.W. 698, 64 A.L.R. 434. See generally Note, "Incompetent Counsel as Ground for New Trial in Criminal Cases," 47 Col.L.Rev. 115 (1947); Comment, "Incompetency of Counsel as a Ground for Attacking Criminal Convictions," 4 U.C.L.A.L.Rev. 400 (1957). As to other aspects of "effective" assistance, see Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (defendant's counsel representing other defendants with conflicting interests); Avery v. Alabama, 1940, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (failure to grant continuance to prepare defense). Michel v. Louisiana, 1955, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83, denying relief to petitioner, clearly carries the implication that in the proper case, depending on the circumstances, appointed counsel may be so ineffective as to render a trial lacking in due process.

for a continuance. MacKenna's defense turned on an alibi, yet the obvious witnesses to prove the alibi were not in court and had not been interviewed by appointed counsel. The attorneys offered to appeal and apparently examined MacKenna's motion for a new trial, with its exhibits, but did not render assistance in the preparation of the motion for a new trial or the appeal.

■ As we see it, an essential element of the fair trial of a defendant with court-appointed counsel is trial court sensitivity to protecting the defendant against hasty trials and against obvious mistakes of young, inexperienced, appointed counsel. A genuflection in the direction of justice by the pro forma appointment of counsel such as MacKenna had is something less than adequate judicial guidance and the furnishing of effective counsel to an accused. In Johnson v. United States, 1940, 71 App.D.C. 400, 110 F.2d 562, 563, the court said:

"The government says that, even if this be conceded, Thomas's testimony was, in the exercise of due diligence, available to the defense at the trial and therefore ought not to be considered after conviction. We think this does not follow. The experienced counselor who represents appellant here did not represent him at the trial. Accused was a colored boy without funds or other means to employ counsel of his own selection, and the court appointed two attorneys to defend him. The defense was conducted by one of them and another member of the bar. These attorneys did not examine the transcript of the testimony taken at the inquest. After the trial, they filed no brief in this court within the time allowed by the rules. The trial court finally asked present counsel to represent the defendant on this appeal. *In the circumstances the failure of counsel to produce all available evidence, in a case involving the life of the accused, should not be held against him. It would be a strange system of law which first assigned*

*inexperienced or negligent counsel in a capital case and then made counsel's neglect a ground for refusing a new trial.*" (Emphasis added.)

In Powell v. Alabama, 1932, 287 U.S. 45, 53 S.Ct. 55, 60, 77 L.Ed. 158, Mr. Justice Sutherland said:

"It is not enough to assume that counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the Court could say what a prompt and thorough-going investigation might disclose as to the facts. No attempt was made to investigate. No opportunity to do so was given. Defendants were immediately hurried to trial. Chief Justice Anderson after disclaiming any intention to criticize harshly counsel who attempted to represent defendants at the trials, said: '* * * The record indicates that the appearance was rather pro forma than zealous and active * * *' Under the circumstances disclosed, we hold that defendants were not accorded the right to counsel in any substantial sense. To decide otherwise, would be to ignore actualities * * *"

## II.

■ In the hearing below the district court held that MacKenna was given a reasonable opportunity to secure the presence and testimony of witnesses. In reaching this result the district court relied on the testimony of MacKenna's counsel: "Each testified that there was no motion for continuance; MacKenna did not discuss with them, did not reveal to them the names of any alibi witness * * * only the name of Dr. Anderson and some members of Alcoholics Anonymous". Again this finding is clearly erroneous in failing to give effect to the recital of fact in the bills of exception submitted to counsel for the state and certified as correct by the Criminal District Court.

There is no doubt that under Texas law the motion was defective for failure to comply with Article 543. There is equally no doubt that, as the trial court certified in Exception II, after submission of the exceptions to counsel for the state, defendant "asked for a continuance" and "protested he had not had time to contact the witnesses who wished to appear in his defense". Exception II states also that the defense counsel "moved for continuance, but that the court had overruled the motion".

According to MacKenna, he gave his attorneys the names and addresses of his witnesses on Friday, September 28. According to his attorneys, he had no fact witnesses, only character witnesses, and because of MacKenna's criminal record it was their considered opinion, with which MacKenna agreed, that he should not take the stand and not put his character at issue; his decision to take the stand brought about his conviction and long sentence. One of the attorneys admitted, however, "I wouldn't swear they weren't given to us, no." The depositions and affidavits show that telephone calls to fact witnesses on the day of the trial support MacKenna's statement that he had alibi witnesses who could not be reached in time to testify. Some of these calls, according to the depositions, came in the morning—before MacKenna took the stand.

The deposition of Mrs. June Chapman, Bookkeeper for Newman-Miller Printing Company, where MacKenna was employed, states that someone—presumably MacKenna or one of his attorneys—did try to reach her by telephone shortly before noon on the day of the trial. She was a fact witness. She kept time-cards on the company's employees. According to her deposition she would have testified that MacKenna was at work until 4:30 P.M. the day of the theft of the camera and that his wife came by the plant, as was her invariable custom, to pick him up after work. A photostatic copy of MacKenna's time-card for October 18, 1955 is in the record. Mrs. Chapman swore, as did MacKenna's wife, that if she had been given reasonable notice she would have testified in his defense.

MacKenna is now divorced. His ex-wife's deposition states that she received a telephone call on the day of MacKenna's trial, urging her to go at once to the Dallas County Courthouse. She stated that the call came in at 1:30 P.M., but that "she was cooking lunch and could not eat, bathe, dress, and get down to court by 2:00 P.M., which was the time the defense counsel said it was necessary for me to be there". She too was a fact witness. She would have testified that her husband did not go to the State Fair Grounds on October 18, 1955, the day the camera was stolen.

Ward Chandler, Editor and Publisher of Chandler Publications, is an official of the company for which MacKenna worked. His deposition states that he was telephoned the morning of the trial by someone he thought was one of MacKenna's defense counsel but whose name he does not remember. He was asked to testify but, because of press of business, could not do so. Mrs. Chandler worked with her husband. Her deposition states that a telephone call came in from someone representing himself to be MacKenna's defense counsel. Mrs. Chandler deposed: "My husband took the call, and when he got through, he said: 'That's a fine way, to call someone the morning of the trial and you can't even get there'".

■ MacKenna contends that before trial the total discussion of the case between himself and his appointed counsel amounted to only fifteen minutes. His counsel say that they spent thirty to forty-five minutes with him. They concluded that MacKenna's witnesses were all character witnesses. If so, the presence of character witnesses was essential to the defense—once MacKenna took the stand. In fact, one of the attorneys testified that he attempted to call Dr. Anderson "to attempt to reconstruct [MacKenna's] character". Had there been reasonable notice of trial or a continuance, character witnesses could have testified. But whether the witnesses were fact witnesses or character witnesses, to force an

accused person to trial at a time when he cannot obtain any witnesses at all falls short of our notion of a fair trial.

In Paoni v. United States, 3 Cir., 1922, 281 F. 801, 803, two defendants and others were convicted for narcotics violations. On June 16, notice was mailed to the defendants' counsel that their case was set for June 22—more notice than MacKenna received. The defendants appeared in court the morning of the trial, but their attorneys did not make an appearance in court until that afternoon. They moved for a continuance on the ground that they had not received notification of the trial date and therefore had no time to procure defense witnesses. The motion was overruled. On appeal, the court observed that it was "gravely impressed" with the contention that the time to get witnesses was inadequate because of the swiftness with which the case was begun when counsel appeared. The court, holding that the trial court abused its discretion in denying a continuance, said:

"Under the Sixth Amendment to the Constitution the defendants were entitled to have the assistance of counsel for their defense and also to have compulsory process for obtaining witnesses in their favor. To one accused of crime these are very substantial rights. *Yet they are barren if given at a time when assistance by counsel in issuing subpoenas is impracticable and when service of subpoenas and the appearance of witnesses is impossible.*" (Emphasis added.)

█ Although Paoni involved the Sixth Amendment and the case was on review by a writ of error, the principle that controlled in Paoni applies with equal force in a habeas corpus proceeding involving the due process clause of the Fourteenth Amendment: the opportunity of an accused to meet the prosecution's case with the aid of witnesses is historically and in practice fundamental to a fair trial. Powell v. Alabama, 1932, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158.

Paoni and the instant case are distinguishable from Mitchell v. United States, 1958, 104 U.S.App.D.C. 357, 259 F.2d 787, in which a majority of the court held that the petitioner was not entitled to a hearing under 28 U.S.C.A. § 2255 on the representation that court-appointed counsel was incompetent. In that case Judge Prettyman, for the majority, emphasized that the decision was *not* one involving "dual interest, insufficient time for preparation, or inadequate notice". 259 F.2d 789. Avery v. Alabama, 1941, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 is distinguishable, because of the attorney's zeal in conducting the defense, the opportunity provided by "Court Week" for the attorneys to investigate, and other "facts and circumstances" peculiar to that case.

Article 543 of the Texas Code of Criminal Procedure sets forth very clearly the requirements for a continuance. We do not question the propriety, the reasonableness, the constitutionality of Article 543. We do not reach that question. "Such detailed and technical requirements of a motion for continuance, no doubt, serve a salutary purpose in a proper case, but they cannot justify putting a defendant to trial when he has been given no fair opportunity to secure the attendance of his witnesses." MacKenna v. Ellis, 5 Cir., 1959, 263 F.2d 35, 42.

The Texas Court of Criminal Appeals did not reach the merits of the question whether a continuance should or should not have been denied. And the denial of the continuance has bearing here only in a "but for" sense: but for the refusal of the continuance, MacKenna might have had a fair trial. The question is whether MacKenna had any trial. There is no trial without due process.

█ Disregarding what might have happened, and considering only what actually did happen, we find a combination of circumstances that unfairly prevented the accused from meeting the prosecution's case. The combination of circumstances we refer to are these: (1) the short notice of the trial set for October

3—the defendant hauled into court on a Friday after six months' imprisonment and notified that his trial would take place the following Wednesday; (2) the advance in the trial date from Wednesday to Tuesday, without notice, forcing defendant to trial at a time when he could not obtain any witnesses; (3) the appointment of inexperienced counsel, over the protest of the defendant; (4) the equivocal relationship of these young attorneys to the District Attorney, making it difficult, if not impossible, for them to oppose the District Attorney's request that the case be moved up; (5) the lack of effective assistance of counsel—in failing to interrogate witnesses, in failing to take steps to have witnesses present at the trial, in failing to apply properly for a continuance, in bowing out with precipitate haste, and, generally, in conducting what can be described only as a half-hearted defense of the accused; (6) the trial court's insensitivity to the need for protecting the defendant from a hasty trial without notice and from the obvious errors of inexperienced appointed counsel.

### III.

This Court is well aware of the abuse of federal habeas corpus by state prisoners.[9] The Court has an "alert deference"[10] to the judgments of state courts and scrupulously avoids unwarranted federal intrusions into state procedures.[11] We are conscious of the caution implicit in Mr. Justice Burton's comment: "There is nothing in the Fourteenth Amendment specifically stating that the long recognized and then existing power of the states over the procedures of their own courts in criminal cases was to be prohibited or even limited."[12] We deplore the vagueness, the uncertainty, the necessity of reliance on individual notions—inherent in applying as a standard of due process a concept such as "fairness" or "fundamental fairness essential to the very concept of justice" or "a sense of justice" or, perhaps, in Cahn's phrase, a "sense of injustice".[13] But MacKenna's request for habeas corpus is properly before us. On the record as we read it, MacKenna did not have his day in court to meet the prosecution's case. A fair chance for an accused person to say his say is so rooted in the traditions and conscience of our people as to be "of the very essence of a scheme of ordered liberty".[14]

For the theft of a camera valued at $250, MacKenna has served a substantial part of his eight-year sentence, having been confined for more than four years. The Court's duty upon a habeas corpus hearing is to "dispose of the matter as law and justice require." 28 U.S.C.A. § 2243; compare 28 U.S.C.A. § 2106. It is our opinion that MacKenna's discharge will best serve the ends of justice. Aderhold v. O'Neill, 5 Cir., 1933, 66 F.2d 85; Reid v. Sanford, D.C.N.D.Ga.1941, 42 F. Supp. 300, 303–04; 39 C.J.S. Habeas Corpus § 102, p. 690, n. 92. The judgment is therefore reversed and the cause remanded with directions to grant the

---

9. See Goodman, Use and Abuse of the Writ of Habeas Corpus, 1948, 7 F.R.D. 313; Parker, Limiting the Abuse of Habeas Corpus, 1949, 8 F.R.D. 171; Pollak, Proposals to Curtail Federal Habeas Corpus for State Prisoners, 66 Yale L.Jour. 50 (1956); Report of the Conference of Chief Justices at Pasadena, California, August 1958.

10. Mr. Justice Frankfurter's phrase, in Malinski v. New York, 1945, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029.

11. See, for example, the recent cases decided by members of this panel: Larson v. United States, 5 Cir., 1960, 275 F.2d 673; T. Smith & Son, Inc. v. Williams, 5 Cir., 1960, 275 F.2d 397; Empire Picture Co. et al. v. City of Fort Worth et al., 5 Cir., 1960, 273 F.2d 529; Williams v. Moore, 5 Cir., 1959, 262 F.2d 335, certiorari denied 360 U.S. 911, 79 S.Ct. 1297, 3 L.Ed.2d 1261.

12. Bute v. Illinois, 1948, 333 U.S. 640, 68 S.Ct. 763, 772, 92 L.Ed. 986.

13. Cahn, Sense of Injustice. (New York U.Pr.1949).

14. Cardozo, Palko v. Connecticut, 1937, 302 U.S. 319, 58 S.Ct. 149, 152, 82 L. Ed. 288, at page 292.

writ and discharge the petitioner. See 28 U.S.C.A. § 2106.

Reversed and remanded with directions.

CAMERON, Circuit Judge (dissenting).

In seeking to formulate a dissent to the exhaustive opinion filed by the majority, I think it appropriate to quote from a Supreme Court opinion an epitome of the spirit in which a federal judge should approach the consideration of a case which may result in setting aside a State court decision in a criminal case:

"* * * in reviewing a State criminal conviction under a claim of right guaranteed by the Due Process Clause of the Fourteenth Amendment, from which is derived the most far-reaching and most frequent federal basis of challenging State criminal justice, 'we must be deeply mindful of the responsibilities of the States for the enforcement of criminal laws, and exercise with due humility our merely negative function in subjecting convictions from state courts to the very narrow scrutiny which the Due Process Clause of the Fourteenth Amendment authorizes.' Malinski v. New York, 324 U.S. 401, 412, 418 [65 S.Ct. 781, 89 L.Ed. 1029]. Due process of law, 'itself a historical product,' Jackman v. Rosenbaum Co., 260 U.S. 22, 31, 43 S.Ct. 9, 67 L.Ed. 107, is not to be turned into a destructive dogma against the States in the administration of their systems of criminal justice." Rochin v. California, 1951, 342 U.S. 165, 168, 72 S.Ct. 205, 207, 96 L.Ed. 183.

And in Darr v. Burford, 1950, 339 U.S. 200, 218, 70 S.Ct. 587, 597, 94 L.Ed. 761, this general test was laid down:

"* * * A conviction after public trial in a state court by verdict or plea of guilty places the burden on the accused to allege and prove primary facts, not inferences, that show, notwithstanding the strong presumption of constitutional regularity in state judicial proceedings, that in his prosecution the state so departed from constitutional requirements as to justify a federal court's intervention to protect the rights of the accused."

The majority here looses the long insensate arm of the federal government and empowers it to filch from the hands of the official of a sovereign State the key to the jail house and to set free one who was duly and legally convicted of violating the laws, not of the nation, but of the State of Texas. This extreme action, as I see it, is not justified by the facts before the Court, or by any authority cited. Two cases by federal courts are relied upon by the majority. The first in Aderhold, Warden v. O'Neill, 1933, 66 F.2d 85. O'Neill was a federal prisoner and this Court held that he had served all but seventy-four days of a *void* fourteen months sentence.[1]

The other federal case is Reid v. Sanford, Warden, D.C.N.D.Ga.1941, 42 F. Supp. 300, 304, in which Judge Underwood ordered a federal prisoner discharged where he found that the conviction was of doubtful validity and that he had "already served about all that would be required on a valid thirty-year sentence."

With such scant supporting authority, the action ordered by the majority here, in my opinion, sets a dangerous precedent, and the reasoning by which its conclusion is reached deserves to be carefully tested.

I.

When this case was before this Court before Judge [then Chief] Hutcheson wrote a very able dissent[2] with which

1. As authority for the discharge we cited only the case of In re Bonner, 151 U.S. 242, 14 S.Ct. 323, 38 L.Ed. 149. The discharge in that case was from the wrong penitentiary so that the prisoner might be turned over to the custodian of the proper penitentiary.

2. MacKenna v. Ellis, 1959, 263 F.2d beginning on page 44.

I am in full agreement. Both of the points now developed in great detail were answered in that dissent. For convenience, I quote a portion of the dissent found on page 46:

"The second point, made by the majority, is no better taken. This is that the denial of his motion for continuance because of its failure to comply with the provisions of Art. 543 of the Texas Code of Criminal Procedure was a denial of due process. Here the majority, without pointing to any authority supporting the view, seems to think and say that the fourteenth amendment prevents or circumscribes the right of the Legislature of Texas to prescribe and of Texas courts to follow the prescribed procedure in criminal cases, and that it may be held that defendant has been deprived of due process when state procedure with regard to the requirements for motion for continuance does not conform to what the majority thinks due process requires.

"Again, with deference but with complete conviction, I assert the law is absolutely settled otherwise, * *

"One of the prime provisions of the Texas statute is that when a continuance is sought for absence of witnesses, the facts which are expected to be proved by the witnesses must be shown 'and it must appear to the court that they are material.' * * *

"Under the facts of this case, to send it back to the district judge to try the issues presented is, I think, a complete rejection of the basic principle that a state, in matters in its own sphere, is sovereign, and that it is not subject to the supervision and control of federal courts."

The majority in the present opinion concedes that the provisions of Art. 543 were not complied with and that those provisions are valid and enforceable. But it does not, in my judgment, follow what it concedes.

II.

The chief discussion by the majority opinion of both of the points sent back by the former decision for trial has as its major thesis that appellant did not want to be represented by attorneys and so told the court, that the court forced attorneys upon him [3] and provided him with attorneys who were inexperienced, incompetent, and who were so beholden to the prosecuting attorneys for the State of Texas that they did not, because they could not, properly look after the interests of the man they were appointed to defend. This major premise is not, in my opinion, sustained by the record.

(a) To begin with, this whole contention was abandoned by the attorney who represented MacKenna before the court below.[4] After all of the testimony was in and the question of arguments was being discussed, the following colloquy took place:

"The Court: In obedience to the opinion of the Court of Appeals rendered January 16, 1959 that I would conduct a hearing, which has been done, to resolve two questions —* * *

"The Court of Appeals says, 'The remaining two grounds which have more substance are: (3) That the trial court forces [sic] the appellant, over his objections, to accept repre-

3. We approved such a practice in Gray v. Ellis, 1958, 257 F.2d 159.

4. Appellant was represented in that hearing by Bernard A. Golding, Esquire, of the Houston, Texas bar. Examination of Martindale-Hubbell Law Directory shows that he was admitted to the bar of Texas in 1927. The fact that he was and is an experienced and successful practitioner is attested by the many important cases which have been argued before this Court and the Supreme Court of the United States, e.g., Indiviglio et al. v. United States, 5 Cir., 1957, 249 F. 2d 549, 551, reversed by the Supreme Court. 1958, 357 U.S. 574, 78 S.Ct. 1381, 2 L.Ed.2d 1547.

sentation of counsel appointed by the Court.'

"I understand that the petitioner is abandoning that one.

"Mr. Golding: I think so, Judge. I frankly and candidly don't think that the review of the decision in my mind doesn't place as much emphasis—"

Near the end of the colloquy the same idea was repeated:

"Mr. Golding: I frankly admit to the Court, and that is only one issue in this case and that is whether or not—

"The Court: Whether he had ample opportunity to have his witnesses present.

"Mr. Golding: Whether or not the refusal to grant the continuance, if such was made, constituted a deprivation of due process."

The majority ignores this narrowing of the issues altogether. But I think it is of great importance and that this experienced and capable attorney, having examined the appellant and subjected his two court-appointed attorneys to a vigorous cross-examination, was convinced that this point was without merit and that the question of the continuance was the only issue remaining in the case.

(b) The court below found the facts under this point squarely against the appellant. The judge was a Texan, familiar with Texas lawyers, Texas practice and Texas judges and, having observed the witnesses as they testified before him in open court, made specific findings, as set out in the margin.[5]

Without question, MacKenna acquiesced in the appointment of the lawyers, giving them, according to his testimony, the names of witnesses, discussing with them whether he should take the stand, and generally consulting with them at least as his advisors—see Gray v. Ellis, supra. The point is, in my opinion, wholly without merit.

### III.

The other question presented, which the experienced counsel representing MacKenna in the lower court thought was the only question involved, was whether appellant's rights under the Fourteenth Amendment were violated by the Texas trial judge (apparently deceased when the case was heard by the court below) in his ruling on the so-called motion for continuance. The majority holds that appellant's constitutional rights were violated chiefly on the ground that one of the numerous bills of exceptions prepared by MacKenna recited that a motion for continuance was made and denied. I do not understand that the majority feels that the recital of this bill of exceptions is final and conclusive, because the opinion frankly admits that the motion mentioned in the bill of exceptions did not comply with valid Texas procedural statutes. The majority further concedes that the court below found the facts on this point against appellant.

It is important to recall that the experienced trial attorney representing MacKenna in the court below manifestly did not consider the recitals of the bill of exceptions final or important. He placed MacKenna on the stand and promptly had him testify to the details of what transpired in the handling of what he called a motion for continuance.

According to MacKenna's testimony, Messrs. Collier and Tucker had been appointed to represent him on Friday, September 28th. The three had a con-

5. "The evidence is that before these lawyers were appointed that MacKenna beckoned to them and they went over and talked to him in the courtroom in Dallas County, that later the same morning they were appointed to represent him. It is the testimony of the lawyers that he did not protest, that he made no objection to their appointment. The testimony of the lawyers is that they did confer with him, they advised with him, and at least some of their advice he did not accept, which of course he was under no obligation to accept. I would resolve that issue and find that the two lawyers in question, Collier and Tucker, were not appointed over his objection."

ference and he gave the attorneys a list of witnesses. On the morning of the date set for the trial, October 2, 1956, MacKenna stated to the judge that his lawyers had not yet obtained his witnesses and "I asked him for a continuance * * * I asked him to give me at least one day, at least twenty-four hours and I could probably get the witnesses by telephone * * * He told me to let my attorneys handle it."

The appointed lawyers testified that they also mentioned passing the case to the judge, although it was their understanding that the witnesses whose names were given them by MacKenna were character witnesses; and that it was their judgment, expressed to MacKenna, that it would be unwise to place any such witnesses on the stand since the fact of the seven former convictions of appellant would be brought before the jury.

At all events, it is conceded that no motion for a continuance as required by Texas law was ever made, and the action of the Texas trial judge upon which appellant predicates his claim of denial of constitutional rights is the judge's failure to grant the motion for continuance which he, himself, had made orally. It

is plain, therefore, that there was no denial of constitutional rights under appellant's own testimony. The court heard all of the testimony of MacKenna and of the lawyers and found that MacKenna had not made out the case stated in his petition.[6]

It is further clear that the witnesses brought forward in appellant's motion in the court below for a rehearing of the petition for habeas corpus would not have given testimony which would have changed the result. The appellant testified categorically that he was in fact at the fair grounds and that he there obtained the camera in question from a man he had come to know in the prison. The date was never made certain, but he fixed it somewhere between October 13th and October 18th, 1955. The main complaint of appellant is that the witnesses whom the two lawyers failed to have present would have testified that he had not been at the fair grounds at or about that time.[7]

Surely the majority opinion fails to demonstrate the likelihood that any attorney would have made any effort to get character witnesses until after MacKenna had, over the attorneys' objection,

---

6. "What the petitioner is asking for here is for me to set aside the ruling and judgment of the state court, which was appealed and affirmed. It is my opinion that judgment of the state court should not be set aside lightly. It should only be done for serious reasons, based upon serious grounds, grounds well established. I do not think that such proof has been made in this case. For the petitioner we have testifying the petitioner only. For the state we have two young lawyers of the state bar. * * *

"In this case the witness, MacKenna, has a considerable interest. I cannot say myself that the strong claims that he makes at this time were existent at the time of the trial, the time of which he is complaining. The two attorneys who testified—and let it be noted that the rule was invoked, that they were both excused from the courtroom and neither heard the testimony of the other—each testified that there was no motion for continuance. * * *"

7. Probably the most important witness under appellant's contention was his for-

mer wife whose deposition was taken and who made the following statement:

"Interrogatory No. 11. From your personal knowledge of the charge against Edward Morgan MacKenna, you could and would have offered testimony in his behalf, showing his whereabouts and other facts concerning the date of the alleged theft, October 18, 1955?

"Answer to Interrogatory No. 11: I do not recall his whereabouts on that day.

"Interrogatory No. 12. Testimony showing that during October, 1955, on every afternoon about 4:30 P.M., you drove to 2218 North Harwood Street, Dallas, his place of employment, picked up MacKenna, drove him home and spent the evening with him?

"Answer to Interrogatory No. 12: I did not.

"Interrogatory No. 13. And, to your best recollection and memory, this specifically included the afternoon and evening of October 18, 1955?

"Answer to Interrogatory No. 13. I do not recall."

taken the stand as a witness. One of the attorneys so testified.

Boiled down, therefore, these conclusions from the testimony are patent: (1) no motion for a delay or continuance was made in writing or in conformity with Texas law, the motion mentioned in the bills of exception obviously being that mentioned in (2) infra; (2) the oral motion which MacKenna made, evidently in the absence of his counsel, was not denied, but the court merely suggested that the matter be handled by the attorneys; (3) the alibi witnesses whose statements were produced on motion for rehearing would not have helped appellant, because he admitted that he did get the camera at the fair grounds and because he was unable to fix any dates, and the witnesses whose statements were proffered were unable to recall any specific dates; (4) no adequate showing is reflected in the record that any person would have testified to his good character, and it is further manifest that, if they had attempted to do so, they would have been met with questions concerning his seven prior convictions of crime.

Under these circumstances we cannot, in my opinion, justify a holding that the findings of the court below were clearly erroneous, and certainly are not justified in holding that the handling of the so-called motion for continuance amounted to denial of due process of law.

Under well settled principles of law, the question of a continuance, even if legally raised, would have been one addressed to the discretion of the trial court: "That the action of the trial court upon an application for a continuance is purely a matter of discretion, and not subject to review by this court, unless it be clearly shown that such discretion has been abused, is settled by too many authorities to be now open to question [citing five Supreme Court cases]." Isaacs v. United States, 1895, 159 U.S. 487, 489,

16 S.Ct. 51, 52, 40 L.Ed. 229. And see also Hardy v. United States, 1902, 186 U.S. 224, 22 S.Ct. 889, 46 L.Ed. 1137; and Avery v. Alabama, 1940, 308 U.S. 444, 446, 60 S.Ct. 321, 84 L.Ed. 377.

## IV.

Reference in the majority opinion to the report of the Conference of Chief Justices at Pasadena, California, August, 1958, and to the other articles listed in Note 9 of the majority opinion indicates that it shares with me the feeling that the handling of habeas corpus by federal courts has been a prime factor in reducing to a low point the esteem in which they are held. Hardly a newspaper can be picked up which does not carry headlines about some revolting crime having been committed by an ex-convict. That group, it seems to me, is copiously replenished by the unwarranted intervention of federal courts into the police power of the States.

This case, it seems to me, furnishes a typical example. The opinion reflects upon the integrity and competence of Texas judges and law enforcement officers; upon the honesty and professional ability of two young lawyers who were commissioned by the court to represent this unfortunate appellant; upon the capacity of the court below to weigh evidence given before him in person and to find the facts as that evidence reflects them. And what is it which the majority finds so convincing as to impel it to so extreme a holding? Essentially, the monstrous tale of a highly educated man seven times convicted of violating society's laws. It is not hard to understand the natural feeling of sympathy such an unfortunate individual arouses. But we, as judges, are not permitted the luxury of allowing our judgment to be swayed by excess of sentimentality. Ours is the duty always to hold the balance true between the constitutional rights of the individual and the protection to which society is entitled.[8]

---

**8.** An illustration of the extent to which people generally are aroused by the feeling that the courts are not main-

taining that balance, but are coddling criminals and neglecting society's vital interests may be found in the remarks

Being convinced that the facts of this case do not justify the action ordered by the majority, and that precious Federal-State relationships are injured by the failure of Federal Judges to exercise restraint in such matters, I respectfully dissent.

of Senator Byrd of Virginia appearing in the Congressional Record of April 25, 1960 at page 8023:

"Mr. President, the chief justices of State supreme courts, in their conference held in Pasadena, Calif., in August, 1958, found that the * * * Supreme Court 'does not seem to have given any consideration whatsoever to the risks to society which might result from the release of a prisoner of this type.'

"The State chief justices were referring specifically to the case of Moore v. Michigan (355 U.S. 155 [78 S.Ct. 191, 2 L.Ed. 2d 167]). But for all intents and purposes, the statement is equally applicable to the Andrew Mallory case which the * * * Court decided on June 24, 1957.

"In this Mallory case the * * * Court seized upon what it chose to regard as a technical flaw in traditionally accepted police practice to turn loose a confessed and convicted rapist to prey again on innocent women.

"Andrew Mallory was arrested again in January 1958, little more than 6 months after he was freed, on charges of housebreaking and assault on the daughter of a woman who had befriended him.

"He was convicted on the assault charge April 4, 1958. Now he is indicted again in Philadelphia for rape and burglary.

"Certainly, the courts of this Nation must protect the rights and liberties of all of the people—but this means protection of innocent people, too. Here we have another example of the pattern of * * * Supreme Court decisions which has undermined the confidence of the American people in the Federal judiciary.

"The effect of the * * * Supreme Court decision in the original Andrew Mallory case was to hold that the police—not the rapist—had violated the law."

Another quotation from the extension of remarks of Senator Byrd appears at page A3746 of the issue of the Congressional Record—Appendix, May 3, 1960:

" 'Some of us believe that enough has been done for those who murder and rape and rob,' said Senator Ervin, 'and that it is time to do something for those who do not wish to be murdered or raped, or robbed.' "